AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

5113 Paddock Road, Apartment B/Apartment 2, Cincinnati, OH 45237

)
)
)
)
)

Case No. 1:20-mj-636

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attacment A-2

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B-1

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841 and 846 | drug trafficking and conspiracy to commit drug trafficking |

The application is based on these facts:
See Attached Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

DEA SA Jeffrey McKinley
*Printed name and title*

Sworn to before me and signed in my presence.
(via FaceTime)

Date: _____ 08/26/2020 _____

City and state: _____ Cincinnati, OH _____

_____
*Judge's signature*

Hon. Karen L. Litkovitz, US Magistrate Judge
*Printed name and title*

## Attachment A-2
## 5113 Paddock Road, Apartment B/Apartment 2, Cincinnati, OH 45237





5113 Paddock Road, Apartment B/Apartment #2, Cincinnati, OH 45237, further described as a two story multi-family dwelling constructed with tan brick with red brick accents on the façade of the building. There is a red and white vertical striped awning extending over the front entrance to the building. The front entrance of the building is a green door with white drapes on the interior of the door. The handle to the front entrance door is on the left hand side and the door opens into a common area. The common area is a small vestibule with apartment doors on either side. There is a brown door with a brass door know leading to the rear of the building. A stairway leads to 2 more apartments on the second floor of the building.  Mailboxes are adorned to the wall on the exterior of the building, outlining the main entrance door of the building. The mailboxes are labeled A1, B2, C3, and D4. Apartment B/Apartment #2 is located to the left on the first floor when immediately entering the common area. There is a brass numerical 2 affixed to the door, which is brown in color. A brass knob is on the right hand side of the door and the door opens into the apartment. The other doors in the apartment have numerals 1, 3, and 4 affixed to their exteriors. The door bearing numeral 1 is on the right hand side when entering the common area on the first floor. The doors bearing numerals 3 and 4 are on the second floor of the building. The door with numeral 3 is directly above the door with numeral 1 and the door with numeral 4 is directly above the door with numeral 4.

**ATTACHMENT B-1**
**Particular Things to be Seized**

The items to be seized are evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, specifically

1. Controlled substances;
2. Drug paraphernalia and items used to prepare controlled substances for sale/distribution;
3. Firearms and ammunition;
4. United States currency, other currency, gold, precious metals, rare coins, gold coins, jewelry, and financial instruments, including, but not limited to, stocks and bonds;
5. Electronic storage devices, such as digital personal organizers and cellular telephones capable of storing electronic data relating to phone numbers, text messages, and addresses; and surveillance equipment;
6. Indicia of occupancy, residency, dominion, control and/or ownership of the premises described above, and including, but not limited to, receipts and bills pertinent to maintenance and improvements, utility and telephone bills, canceled envelopes, and keys;
7. Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or objects relating to transporting, ordering, purchasing, processing, storing, and distributing controlled substances;
8. Address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of individuals to show associates of the occupants and indicia of occupancy;
9. Financial records, financial statements, receipts, statements of accounts and related bank records, money drafts, letters of credit, money orders and cashier's check receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transferring and/or concealing of assets and the obtaining, secreting, transferring, concealing, and/or expending of money.

**UNITED STATES DISTRICT
COURT SOUTHERN DISTRICT
OF OHIO WESTERN DIVISION**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 5113 PADDOCK ROAD, APARTMENT B/APARTMENT 2, CINCINNATI, OH 45237 | **CASE NO.** 1:20-mj-636 <br><br> **UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANT

I, Jeffrey S. McKinley, a Special Agent with the Drug Enforcement Administration ("DEA"), being duly sworn state that:

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I have been employed as a Special Agent with DEA since August 2010. I am currently assigned to the Detroit Field Division, Cincinnati Resident Office ("CRO"). I have received specialized training from the DEA, including a 19-week Basic Agent Training course at the DEA Academy in Quantico, Virginia from August-December 2010. This training focused on methods of unlawful drug trafficking; the identification of controlled substances; surveillance; undercover operations; confidential source management; the means by which drug traffickers derive, launder, and conceal their profits from drug trafficking; the use of assets to facilitate

1

unlawful drug trafficking activity; and the law permitting the forfeiture to the United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate drug violations.

3.　　　During my tenure with DEA, I have participated in investigations involving complex criminal conspiracies and drug trafficking organizations. I have conducted investigations into the unlawful importation, possession, and distribution of controlled substances, and the related laundering of monetary instruments, as well as conspiracies to commit these offenses, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. §§ 1956 and 1957. In these investigations, I have led and participated in the execution of search warrants to seize evidence of violations of federal law and arrest warrants to apprehend individuals who commit such violations. I have also participated in many aspects of criminal investigations including the issuance of subpoenas, reviewing evidence, conducting physical and electronic surveillance, working with informants, interviewing witnesses, monitoring consensually recorded meetings and telephone calls and conducting court-authorized interception of wire and electronic communications. Additionally, I have learned the methods used by individuals to commit criminal activity through the interviews of numerous defendants, informants and other witnesses involved in criminal activity. I have also become familiar with the methods used by such individuals to avoid detection by law enforcement, including use of cellular telephones that are subscribed to the names of other persons; prepaid cellular telephones; counter-surveillance techniques; coded and ambiguous language; multiple vehicles; and false identities. I have also become familiar with the methods, language, and structures of drug trafficking organizations.

2

4.     By virtue of my involvement in drug investigations, I have become familiar with the various means and mechanisms used by narcotics traffickers to import and distribute controlled substances and to conduct their illicit business without being detected by law enforcement.  I am familiar with the fact that drug traffickers make tremendous profits through drug trafficking and require large amounts of currency to operate surreptitiously.  In this regard, I have obtained and executed numerous search warrants pursuant to which I have seized ledgers, notebooks, papers, and other related record-keeping instruments, all of which have been used to record multiple narcotics and related money laundering transactions, telephone books, diaries, invoices, beepers, cellular telephones and correspondence, all of which have contained evidence of narcotic trafficking and money laundering violations.

5.     Facts set forth in this affidavit are based on personal knowledge derived from my participation in this investigation and upon information and belief.  I have not included each and every fact and circumstance of which I am aware.  I have set forth only those facts that I believe are necessary to establish the probable cause for the issuance of the requested search warrants. The sources of my information and belief include oral reports about this and other investigations that I have received from agents of the DEA and other law enforcement authorities and enforcement conducted by agents of the DEA or other law enforcement authorities, which have been reported to me either directly or indirectly.

6.     The primary targets of the investigation are:

    a.  Marocko Conley, a narcotics trafficker who conspires with several other individuals in the Northern Kentucky/Cincinnati area.  Conley's primary residence in Covington, Kentucky has been identified as **2218 Sterrett**

3

Avenue, Covington, Kentucky (**TARGET LOCATION 1**).

b. Delbert Gilliam Jr. has been identified as a sub-distributor of narcotics for Conley. Gilliam's primary residence has been identified as **5113 Paddock Road, Apartment B, Cincinnati, Ohio (TARGET LOCATION 2)**.

c. Keontaye Stokes has been identified as a sub-distributor of narcotics for Conley. Stokes' primary residence has been identified as **357 East 16th Street, Apartment #1, Covington, Kentucky (TARGET LOCATION 3)**.

d. Michael L. Chandler has been identified as a sub-distributor of narcotics for Conley. Chandler's primary residence has been identified as **4254 Berry Wood Drive, Apartment # 4, Independence, Kentucky (TARGET LOCATION 4)**.

e. Antwain Fox Sr. has been identified as a sub-distributor of narcotics for Conley and a suspected source of firearms for Conley. Fox Sr.'s primary residence has been identified as **3372 Appomattox Drive, Erlanger, Kentucky (TARGET LOCATION 5)**.

7. This affidavit is made in support of an application for a search warrant to search the following locations:

a. **2218 Sterrett Avenue, Covington, Kentucky,** (hereinafter referred to as **TARGET LOCATION 1**), fully described in attachment A-1, attached hereto and incorporated herein by reference, for those items listed in Attachment B-1, attached hereto and incorporated herein by reference.

4

b. **5113 Paddock Road, Apartment B, Cincinnati, Ohio,** (hereinafter referred to as **TARGET LOCATION 2),** fully described in attachment A-2, attached hereto and incorporated herein by reference, for those items listed in Attachment B-1, attached hereto and incorporated herein by reference.

c. **357 East 16th Street, Apartment #1, Covington, Kentucky** (hereinafter referred to as **TARGET LOCATION 3**), fully described in attachment A-3, attached hereto and incorporated herein by reference, for those items listed in Attachment B-1, attached hereto and incorporated herein by reference.

d. **4254 Berrywood Drive, Apartment #4, Independence, Kentucky** (hereinafter referred to as **TARGET LOCATION 4**), fully described in attachment A-4, attached hereto and incorporated herein by reference, for those items listed in Attachment B-1, attached hereto and incorporated herein by reference.

e. **3372 Appomattox Drive, Erlanger, Kentucky** ((hereinafter referred to as **TARGET LOCATION 5**), fully described in attachment A-5, attached hereto and incorporated herein by reference, for those items listed in Attachment B-2, attached hereto and incorporated herein by reference.

8.　　Based upon the probable cause described below, I believe that **TARGET LOCATIONS 1, 2, 3, and 4** have been regularly used, and are currently being used, to facilitate drug trafficking in the Northern Kentucky/Cincinnati area, and elsewhere. As a result, there is probable cause to believe that a search of **TARGET LOCATIONS 1, 2, 3, and 4** will reveal evidence of crimes, contraband, fruits of crimes, or other items illegally possessed and property

5

used to commit crimes concerning violations of 21 U.S.C. §§ 841(a)(1) and 846. I believe that **TARGET LOCATION 5** has been regularly used, and is currently being used to facilitate illegal firearm possession, and as a result, a search of **TARGET LOCATION 5** will reveal evidence of crimes, contraband, fruits of crimes, or other items illegally possessed and property used to commit crimes concerning violations of and transfer, in violation of 18 U.S.C. §§ 922(g) and 924(h).

## BACKGROUND OF CASE

9.      The following events form the basis for probable cause for the search and seizure warrants requested in this affidavit.

10.      DEA Cincinnati began investigating Marocko Conley in 2017 after receiving information from confidential sources (CSs) that Conley was a methamphetamine trafficker. For example, in May 2020, agents interviewed a confidential source (CS-1) who knew that Conley was supplying cocaine and fentanyl to a man in Cincinnati known as "Rocket." He/she also knew that Conley was supplying fentanyl and methamphetamine to a man known as Ricardo Gordon in Cincinnati. I believe CS-1 to be reliable because he/she has allowed agents to monitor his/her calls and text messages with Conley's phone (513-903-5979). The confidential source has also provided information that has been independently verified by agents. The confidential source cooperated in hopes of receiving judicial consideration on behalf of another person.

11.      On May 19, 2020, the Honorable Douglas R. Cole of the Southern District of Ohio signed an order authorizing the interception of wire and electronic communications over

6

513-903-5979, utilized by Conley. Subsequent authorizations for wire intercept of communications over 513-903-5979 were signed by Judge Cole on June 22, 2020 and July 29, 2020.

## TARGET LOCATION 1

12. In March 2019, another confidential source (CS-2) advised law enforcement that Conley was in charge of a drug trafficking organization (Conley DTO) and lived at **TARGET LOCATION 1** with his wife and son. I believe CS-2 to be reliable because he/she was formerly embedded within the DTO, made statements that were independently verified by law enforcement, and made statements against his/her interest. That confidential source was providing information in hopes of receiving judicial consideration. In March 2020, agents conducted a search using a records database available to law enforcement and located an incident that was reported by Conley to the Covington Police Department on December 3, 2019 (Covington Police Department Incident # 2019-060708). Conley reported a "hit skip" traffic accident, and the report listed the phone number in the "call details" as "513-903-5979." The incident location address was listed as **TARGET LOCATION 1**. Throughout the investigation, agents have repeatedly and continuously confirmed Conley currently resides at **TARGET LOCATION 1**, based on regular physical surveillances from March to August, 2020, electronic surveillance of Conley's cellular phone, GPS surveillance of Conley's vehicles (both personal and rental), and CS information. Additionally, on May 28, 2020, United States Magistrate Judge Candace J. Smith signed a tracking warrant for Conley's personal car, and GPS surveillance has shown that the car is routinely located at **TARGET LOCATION 1**.

13.     On June 3, 2020, agents intercepted text messages between Conley and cellular number 513-903-3230, which is believed to be utilized by Keith Mack.  The intercepted communication between the two was as follows, and began at approximately 10:06 a.m.:

> Mack:  Gm bra can I get the 2/half
>
> Mack:    Same thing like last time
>
> Conley:    Yeah I'm at the crib
>
> Conley:    175...
>
> Conley:    Come around back
>
> Mack:      My guy
>
> Conley:    How long you gonna be
>
> Mack:    20 minutes tops on 16th now   waiting on my lick to come back from the store
>
> Conley:    Ok

14.     Based on my training and experience, I believe that the above-conversation relates to drug trafficking.  Specifically, Mack was requesting a quantity of drug from Conley, and Conley replied that he was at his "crib," which is slang for Conley's residence.  Mack then indicated he was on his way to Conley's residence, which is **TARGET LOCATION 1**, to pick up the drugs**.**

15.     A short time later at approximately 10:06 a.m., agents separately intercepted a phone call between Conley and Delbert Gilliam, Jr., in which Conley told Gilliam that "Lil Bra" had "some bands" for Conley.  Based on my training and experience, I believe that "bands"

8

refers to money, and based on the other drug-related conversations intercepted between Conley and Gilliam, I believe that money to be related to drug trafficking.

16.     A short time later, at approximately 10:45 a.m. on June 3, 2020, agents established surveillance in the area of **TARGET LOCATION 1.**  Consistent with the above-described phone call between Gilliam and Conley, an agent saw a black male wearing a black cutoff t-shirt with white undershirt and black pants standing on the front porch of Conley's residence, (**TARGET LOCATION 1)**.  The agent identified the male on the porch to be Delbert Gilliam, Jr. based on a comparison to Gilliam's driver's license photo and prior surveillance photos of Gilliam.  Agents have intercepted Gilliam on multiple occasions during the period of monitoring Conley's cellular phone from May to August, 2020, speaking about what agents believe to be drug-related subjects, including obtaining drugs from Conley and introducing Conley to a potential source of drug supply.  For example, on June 2, 2020, agents intercepted a phone call in which Gilliam told Conley about a "Muslim brother" in the "A" that had "jewelry" available at "4, for 36." Based on my training and experience and my knowledge of this investigation, I believe that Gilliam was arranging a meeting with a source of supply of methamphetamine.  I believe "A" was a reference to Atlanta.  Agents have learned through CS-1 that the Conley DTO uses "jewelry" as code for methamphetamine.  As noted previously, I believe CS-1 to be reliable because agents have corroborated other information provided by the CS; the CS has provided incriminating information, and the CS has been cooperative with law enforcement in investigating Conley.

17.     At approximately 10:53 a.m. still on June 3, 2020, I advised agents conducting surveillance near **TARGET LOCATION 1** of a recent intercepted phone call between Conley

9

and Gilliam. I advised agents conducting surveillance that Gilliam told Conley he was 'here" and Conley advised Gilliam to go "around back."

18.     Consistent with the above-described phone call, an agent saw Gilliam walking towards the rear of Conley's residence at **TARGET LOCATION 1.** Another agent, who was also conducting surveillance near **TARGET LOCATION 1**, observed a green Honda CRV bearing Ohio registration, HWJ3547 parked on Sterrett Avenue across the street from Conley's residence. The agent recognized the green Honda from prior surveillance that had been conducted at 5113 Paddock Road, Cincinnati, Ohio, which is **TARGET LOCATION 2**, and is described in greater detail below.

19.     At approximately 11:16 a.m., Mack sent Conley a text message that said "Be there in 4 minutes." Conley responded "Ok." At approximately 11:18 a.m., I advised agents conducting surveillance about the intercepted text message communication between Mack and Conley.

19.     At approximately 11:19 a.m., an agent was conducting surveillance in the area of Wallace and Sterrett Avenue, near **TARGET LOCATION 1**, and observed an older model white Lincoln with black top stop on Sterrett Avenue near Conley's residence at **TARGET LOCATION 1**. Another agent saw the white Lincoln turn around and park near Conley's residence at **TARGET LOCATION 1**. The agent observed a black male wearing a tan shirt, light colored shorts that had designs on them walk to towards the rear of the of the residence. The agent identified the male in the white Lincoln as Mack by comparing the individual to a driver's license photo of Keith Mack.

10

20.     At approximately 11:40 a.m., the agent observed Mack walk from the driveway at **TARGET LOCATION 1** to the white Lincoln.  Mack was observed removing an item(s) from the trunk of the Lincoln.  Mack then proceeded toward the rear of Conley's residence out of the agent's sight.

21.     At approximately 11:42 a.m., another agent, who was also conducting surveillance in the area of **TARGET LOCATION 1**, observed Mack on the rear porch of Conley's residence.

22.     At approximately 12:14 p.m., an agent observed Mack, Gilliam, and Conley, who agents identified based on prior surveillance and knowledge of the investigation, walking down the steps of the rear porch.  A few minutes later, an agent saw Conley, was wearing a white t-shirt and camo shorts standing with Mack and Gilliam near the drive-way of the residence.

23.     At approximately 12:18 p.m., an agent observed Mack enter into the white Lincoln and proceed north on Sterrett to Wallace.  Conley and Gilliam remained standing in the drive-way of **TARGET LOCATION 1**.

24.     Based on the intercepted phone calls and text messages, the surveillance, and my training and experience, I believe that Mack was picking drugs up from **TARGET LOCATION 1** and that Gilliam was either dropping of drug proceeds to Conley or picking up drugs from Conley at **TARGET LOCATION 1.**

25.     On June 5, 2020 beginning at approximately 7:25 a.m., agents intercepted text messages between Conley and cellular number 513-903-3230, which was believed to be utilized by Keith Mack.  Below is an excerpt of that exchange:

Conley: Let me get my 80 bucks... can't miss nothing

11

Mack: I got it bra

Conley: Okay... how you doing

Mack: Cool just got up

Conley: Blessings

26.     Based on my training and experience, I believe the above-conversation to be drug-related.  Specifically, agents believe that Conley is collecting debts when Conley requests, "Let me get my 80 bucks ....can't miss nothing."  Agents believe this debt is for drugs that were advanced or "fronted," potentially the same drugs that Mack picked up from Conley on June 3, 2020.

28.     At approximately 11:44 a.m. on June 5, 2020, I intercepted a telephone call from Mack to Conley.  During the conversation, Mack asked Conley if he was at "the crib." Conley indicated he was and "just pulled up."  Mack advised Conley he was going to the Metro PCS and he would be over there in "twenty (20) minutes."  At approximately 11:57 a.m., an agent established surveillance in the area of Conley's residence.  The agent observed a white Lincoln with black top parked in the area of Conley's residence at **TARGET LOCATION 1**. The agent recognized this vehicle to be the vehicle that Mack was previously observed driving by fellow agents of CRO.

29.     Between June 9, 2020 and June 12, 2020, agents intercepted phone calls between Conley and Gilliam, in which Conley requested Gilliam to arrange a meeting in Atlanta with a potential source of drug supply.  Agents also intercepted phone conversations between Conley and others, which confirmed that Conley planned to leave for Atlanta on Friday, June 12, 2020.  Through wire interceptions and physical surveillance, agents also learned that Conley had

12

rented a 2020 black Dodge Charger four-door, bearing Kentucky License Plate 791ZWZ, VIN#

2C3CDXBG7LH119222 from Enterprise.  On June 12, 2020, U.S. Magistrate Judge Christopher

Bly of the Northern District of Georgia signed a tracking warrant for the Black Dodge Charger.

Agents subsequently installed the GPS tracker on the Dodge Charger.  On July 27, 2020, this

Court signed a tracking warrant to continue GPS monitoring of the Black Dodge Charger.

30.     On June 12, 2020, agents established surveillance in the area of **TARGET**

**LOCATION 1** in anticipation for Conley's trip to Atlanta, GA.  Agents observed Conley,

Kandice Conley (Conley's wife), and a juvenile male, believed to Conley's son loading items in

the black Dodge Charger rental car.  At approximately 2:00 p.m., Conley accompanied by his

wife and juvenile son proceeded to drive out of the area towards Interstate 75 (I-75).  Agents

surveilled Conley as he drove south on I-75 through Kentucky, Tennessee, and into Georgia.

Agents eventually observed where Conley arrived at a location in Kennesaw, GA, which is

located in the Atlanta metropolitan area.

31     On June 12, 2020, at approximately 1:45 p.m., an agent intercepted a text

message from Conley to Gilliam, "You missed a $2000 play bro."  At approximately 2:37 p.m.,

Gilliam responded to Conley, "???".  At approximately 2:41 p.m., agents intercepted a telephone

call from Gilliam to Conley. During the conversation, Conley advised Gilliam, "Hey, I'm going

to text you the info about the dude" and continued by telling Gilliam, "there is a plate sitting up

there for you, from what I gave you."  Conley advised Gilliam, "I left a little bit sitting out."

Conley instructed Gilliam, "You going to have to grab it, put it together and take it to the big

fellow and he is going to give you 18 bucks."  Conley advised Gilliam, "But I left enough, all

you going to have to do is put like 7 or 8, I'll figure it out and let you know."

13

32.     Based upon the above-intercepted communication, I believe that Conley was instructing Gilliam to retrieve drugs from **TARGET LOCATION 1** when Conley said, "I left a little bit sitting out." Moreover, I believe Conley was also instructing Gilliam to complete a drug transaction when he told Gilliam, "You going to have to grab it, put it together, and take it to the big fellow and he is going to give you 18 bucks."

33.     During the weekend of June 12, 2020, agents intercepted several phone calls between Conley and Gilliam discussing where to meet the source of drug supply in the Atlanta area. Eventually, Conley and Gilliam agreed to meet at the "Cozumel Mexican restaurant" in College Park, Georgia on June 14, 2020.

34.     Following the above-referenced communications, during the evening of June 14, 2020, agents observed Conley, Gilliam, and a then-unidentified black male near the front of the Cozumel Cantina Mexican Restaurant at 5058 Old National Highway in College Park, Georgia. Agents noted that the then-unknown male was wearing a baggy shirt, and had his right arm concealed inside his shirt. Agents who were conducting surveillance observed that the then-unknown male, he appeared to be pressing something against his body, while holding a cellular phone with his right hand, which was protruding from the bottom side of his shirt. After greeting each other, Conley, the then-unknown male, and Gilliam entered Conley's Dodge Charger rental car, which was parked nearby.

35.     After being inside the Dodge Charger rental car for several minutes, the three exited the car, and Conley made a very brief call to phone number 470-725-6813. Conley did not speak to anyone, and agents believe he was simply entering the number of the then-unknown male into his phone. An agent entered the phone number into commercial database available to

14

law enforcement, and it returned to Sean Williams. Additionally, surveillance units noticed that when the unknown male exited the vehicle, his right arm was now free of the inside of his shirt, and did not appear to be pressing anything against his body at that time. Following the meeting, Conley left the area, and Gilliam left in Conley's dark blue Chevrolet Malibu. The unknown male left in a Kia car. I observed a driver's license photo of Williams, compared it to surveillance photos of the unknown male, and believe the unknown male to be Sean Williams. Via electronic surveillance, Agents noted that following the meeting with Conley, Williams, and Gilliam, Conley's vehicle in which he was traveling (Dodge Charger) proceeded from the Atlanta area back to his residence on Sterrett Avenue (**TARGET LOCATION 1).**

36.     On July 4, 2020, Conley texted Gilliam that "Those new blues Lil Bro had looked all the way not off so I wasn't going however DEF sitting in the trashcan on the front porch the Bears can." Based on my training and experience, particularly with this case, I believe that Conley was informing Gilliam that he (Conley) had left "blues," which are believed to be a drug in blue pill form, in a Chicago garbage can on Conley's front porch in order for Gilliam to retrieve.

37.     During July and August, agents have intercepted phone calls and text messages which suggest that Conley continues to distribute and direct the distribution of several different types of drugs. Some of those calls are detailed as it relates to **TARGET LOCATION 1** and other target locations described below.

38.     On August 17, 2020, Gilliam called Comely. The relevant portions of that conversation are outlined below:

*****

15

CONLEY: Man listen, I'm gonna pull up on you any second. I just got out of the --

GILLIAM: Alright. What bro?

CONLEY: I said I'm going to pull up on you in a second, I just got out the shower.

GILLIAM: Ok.

CONLEY: I'm going to pull up on you. Man, I want you see this mother fucking new album we got boy.

GILLIAM: Oohhhhh

CONLEY: Ooohhhh

GILLIAM: New rock band release?

CONLEY: What?

GILLIAM: Hmmmm, hmmmm

CONLEY: Smokey Robinson, Jr. Smokey Robinson, Jr

GILLIAM: hmmm Ok I um

CONLEY: I'm going to bring you a half of dis over there so you can god dammit uh uh go ahead and promote this, give it to a couple CEO's and managers or something and see what they think about it. Know what I mean.

GILLIAM: Ok, Ok. Right, you just got out the water?

CONLEY: Yeah, Yeah. I'll be over there in about 20 minutes.

GILLIAM: Ok

CONLEY: Alright.

38.     Based on my training and experience, particularly within this case, I believe the conversation between CONLEY and GILLIAM was drug related. I believe CONLEY was

16

referring to some type of drug when he mentioned "Smokey Robinson Jr.," and my belief was strengthened when he told GILLIAM "I'm going to bring you a half of dis over there so you can God dammit uh, uh, go ahead and promote this, give it to a couple CEO's and managers or something and see what they think about it." I believe within that particular dialogue, CONLEY was telling GILLIAM he was going to bring GILLIAM a type of drug, and GILLIAM would subsequently give it to individuals in order for them to test. Additionally, I believe CONLEY was at **Target Location 1** when the conversation occurred, based on GILLIAM asking CONLEY if he'd just gotten out of "the water," meaning he had just taken a shower. I subsequently believe CONLEY was storing whatever drug to which he referred at **Target Location 1.** I also believe that CONLEY was taking some of that drug to GILLIAM's residence at **TARGET LOCATION 2.**

39. On August 17, 2020, CONLEY engaged in a phone conversation with a male preliminarily identified as Antonio JONES, who is believed to possibly reside in the Atlanta area. The conversation is outlined below:

MC: Yoooooooo.

AJ: What up bro?

MC: What's up broski how you?

AJ: Man I'm gucci how you feel?

MC: I'm alright man, movin around a little bit. How you? Whats going on?

AJ: Ah shit man, what the streets talkin about?

MC: Ahhh you know I'm tryin to figure it out. Wuch you got going on? You tying to do what I'm doing?

17

AJ: What you got?

MC: (cough and laughing) A little bit of everything man. I ain't, you know, were on the line so, you know I'm in tune though.

AJ: Yeah, yeah, yeah,

MC: You know what I mean?

AJ: I just, I just, I just ran into some more shit too myself.

MC: All yeah, what it look like?

AJ: Boy, you heard about that bible?

MC: Mmmmmmmm. New shit huh?

AJ: Yeahhhh.

MC: You got Facetime?

AJ: Yeah I got that um, that duo shit.

MC: Alright look, check it out bro, don't say nothing to nobody else until you let me know what the fuck this is so I'm finna, I'm going to hit you in a minute. I'm finna, I got one stop I have to make and I gotta stop at the bank then I'm going to be back at the house and I'm going to hit you ASAP.

AJ: Yeah, yeah, hey cuz look, when I tell you it's official bro. Yeah I got about, I got about 50 mother fuckin stains in the one.

MC: All, come on man.

AJ: Walmart, Best Buy, mother fuckin Nike, mother fuckin you name it nigga, cash app. Uhh, however, whatever, however you wanna do it I got it. I got.

MC: Ohhhhhhhhh mannnn. You might want to pull up boy. (laughing).

18

AJ: I got the bible nigga.

MC: Alll my god this shit crazy man. Alright look, look bro, let your brother get, I'm in traffic man let me sit still real quick. I'm going to Facetime you and well be.

AJ: It's definitely something we got to talk about.

MC: Yeah bro, let me get, let me get situated. I'm calling you as soon as I get back to the house.

AJ: Alright.

MC: Soon as I get back to the house.

AJ: Alright.

MC: Bye

59.     Based on my training and experience and knowledge of this case, I believe the outlined conversation was drug related. Specifically, when JONES asks CONLEY "What you got?" and CONLEY responds "A little bit of everything man. I ain't, you know, we're on the line so, you know I'm in tune though." I believe the male was asking CONLEY was he had, specifically what types of drugs, and CONLEY stated "A little bit of everything". My belief was solidified the two were referring to drugs when CONLEY continued, saying I ain't, you know, we're on the line so, you know I'm in tune though." I believe CONLEY was reminding the male that they were speaking on a phone line, which is subject to interception by law enforcement. I believe there would be no reason for CONLEY to mention being "on the line" if the conversation was simply innocuous, and not moving toward drug discussion. As the discussion progressed, the male believed to be JONES, mentioned having "stains," which I believe to be hits of LSD, or "acid." JONES further stated he had a "bible," which I believe to be a large amount of hits, or

19

dosage units, of LSD. CONLEY then instructed him to refrain from telling anyone else about what he had told CONLEY, and specifically asks about the male having FaceTime, which further strengthens my belief that the two were referring to drugs, as FaceTime is far more difficult to intercept by law enforcement.

60.     On August 18, 2020, Agents intercepted a conversation between CONLEY and GILLIAM which referenced a "bible," which is discussed above in the call between CONLEY and the male believed to be Antonio JONES. The conversation between CONLEY and GILLIAM is transcribed below:

MC You find the address Ack.

DG: Yeah bro. I'm here. i was, when i was talking to you I was pulling up. 3166 Harrison, it's the old H&R Block building up here on Harrison. This a Muslim but an African brother and um. I already did work for his big brother. They killed his big brother years ago up there, um, up there in North College Hill, shot him, robbed him. And he lil' bro, he still been, he still been, you know we keep tabs, he be buying property and shit the U/I.

MC: Ok, Ok.

DG: He from Senegal and uh, yeah, I want you to meet him too

MC: Ok. Ok.

DG: I want you to meet him. I'll tell you about him, later, little later on. He serious. You know how we be getting to buying those U/I in Africa.

MC: Yeah you told me that a while back.

20

DG: Yeah, yeah, we was getting like, like, we invest like. I used to do it years ago, 6,7 thousand when his brother was alive.

MC You know, it's a it's a crazy thing that you brought that up. Because, I bought this thing, I bought this thing, man that they call the Bible.

DG: Uh huh

MC: Shh, It's a good investment bro. I just ain't. Man when you see it you going to be like nahbro, you had this up your sleeve all the time. It's like a million dollar bible bro. Nah, it's really priceless, it's worth more than a million, it's like whatever you feel you want to make off this joint you see what i'm saying, like for real.

DG: Damn, ok

MC: Nah, listen. I just. I just went through some information I'm like ah yeah that's good U/I you feel me. Man, I was researching yesterday like.

DG: Hold up bro, hold up, this my U/I

MC: Aight go ahead, go ahead.

61.     Based on my training and experience within this case, I believe the above conversation to be drug related.  I believe CONLEY was referencing buying a large amount of LSD dosage units when he referenced a "bible," and further elaborated on his belief that "It's like a million dollar bible bro. Nah, it's really priceless, it's worth more than a million, it's like whatever you feel you want to make off this joint you see what I'm saying, like for real."  I believe CONLEY was telling GILLIAM a large amount of money could be made from the "bible."

62. On August 21, 2020 at approximately 1:17 p.m., an unknown male called Conley.

Below is a transcript of that conversation:

CONLEY: Hey good lookin what's up?

UM-3592: You never, you never came to me at all Ack

CONLEY: Man cut it out man you was supposed to pull up

UM-3592: You was supposed to come to me

CONLEY: Man I told Del two weeks ago, I said Sheed was supposed been pulled back up on us boy

UM-3592: Nah, you was supposed to pull back up on me. Man, you told me that. remember I'm gonna come to ya, remember he like, I'm gonna come to you, remember cause ij, he, he, he had some, he had some um, paperwork he had that paperwork that you all was dealing with. You was supposed to bring some paperwork so I could look it over.

CONLEY: Damn I don't know. I thought. It don't matter. It's, the shelf full of that shit that ain't moving and it's fire as hell. I was telling him I was like damn, I could use an extra leg, a foot.

UM-3592: Man I said man what's up

CONLEY: Hell yeah that shit, and it's thunder, it's retarded thunder, it's just congested. Know what I mean it's overly congested all the way out here. I was tellin bro I might go to Iowa. Fuck it. You feel me. Because there ain't nothin going out this mother fucker. Everybody that got some activity even my whole roster. I can get em a hand off and itta just be sitting. Cause the fucking. It just is what is out this mother fucker. Everybody active. Everybody active. Everybody active. I dropped the number 1300 just to push you see what I'm saying cause I have so much. I still ain't, I ain't, I ain't, and mother fuckers love it still, I ain't sold two zip off that mother fucker and it's about half a book.

UM-3592: Wow

CONLEY: Yeah. You all, that's what I was tellin them. I was like bro know what I mean, one point, the number, the rotation be good you feel me and ten when you mother fuckers get the beef up shit nobody can put in the work to get some pip but when it's trash everyone take U/I.

See what I'm say

UM-3592: Right

CONLEY: I don't understand that shit.

UM-3592: I don't understand it either. I don't understand it.

CONLEY: Bro cried for about two weeks, nah he cried for about a week so I finally fixed it. Get him situated. Now its been a week and he ain't even turned in a red pickle or nothing. You feel me. I had to go to the store and get the perks by myself. Ain't no one had no count. You feel me. Then the rest of the count, then the rest of the count, like i said that's what I be tell em' if you invest in the pot you still got to put in the work now you niggas tryin to make it disappear. You feel me. I meant like, I got four other things going on in four different divisions. You see what I'm saying. So if the erk's aren't working I switch to ya dig just to keep the double up. I can't switch from the erk's to the

22

tree with somebody else paperwork cause the numbers ain't gonna come out right. You feel me. Like it don't make sense. You only switch to the double up. You feel me.

UM-3592: Right

CONLEY: So I switch to the double up cause everybody's crying about not having no mother fucking ya dig and I get the ya dig and it's thuuunnder, you feel me, retarded thunder. Now nobody can just make it disappear. Now I gotta get on puttin', the the the skits caboodle and do all the extra leg work just to keep everybody's count situated. Ain't nobody doin shit. You feel me.

UM-3592: That's what I said, that's why I told you, that's why I told you should've met with me. Cause I, my nephew U/I I told him, like look, I'm gonna see you all but you ain't never come by. You know I ain't, I know, I know how busy things get cause I know how I get busy, know what I'm saying. I ain't going to be on nobody's head or nobody's back. I don't do that. I don't care what kind of paperwork i got involved.

CONLEY: Yeah yeah, yeah, yeah, but it's crazy cause I told bro, listen, it's crazy, cause this what I mean about his communication too. Damn you talked to Sheed twice this week. Why ain't you tell him to pull up at the crib. You feel me. Cause I ain't going no where I am at the crib, you see what I'm saying, so I'm like tell him to pull up at the crib. See I told him woo woo woo, I told him he must be working a job.

UM-3592: He ain't tell me that, he ain't tell me that, U/I he ain't tell me that.

CONLEY: Man he crazy.

UM-3592: I don't even know why, U/I cause he, every time I talk to him if I don't tell him about something he like man get off the phone

CONLEY: That's another thing. I don't know why he ain't told you even if you was asking like what's up with U/I, why he ain't say like bro come over here and grab one of these joints cause bro wanted you to have that thing checked out U/I see what I'm saying.

UM-3592: Damn man

CONLEY: Crazy man.

UM-3592: He'll, Yeah he'll tell me about it, but he ain't saying nothing else come meet me kno what I mean, I don't want to disturb nobody's earth nothing like, I don't disturb nobody's earth.

CONLEY: That joint, That joint sittin over there. That joints sittin over there.. Like I told them, I fittin to go OT, I'm going to clear the shelves of that shit. I'm going to give mother fuckers their dividends and then I'm gonna see what the fuck they want to do from there. I ain't going to be putting all the foot work in and god dammit makin sure, you see what I'm saying nah that shit ain't make sense. I can keep doin what I'm doin. [cross talk]

UM-3592: Nah, nah, you can't do that. You can't do all the footwork nahhhh understand the first time U/I, it ain't no recurrence now, it ain't no recurrence for that know what I'm sayin everyone gotta draw their own documents up. Cause everybody gotta have, everybody gotta have their own business plan.

CONLEY: Exactly

UM-3592: You know.

23

CONLEY: I'm going to let em, I gotta, I'm leaving tomorrow, I gotta sit today, cause I was waiting on some jewelry, I'm waitin on some jewels. You feel me.

UM-3592: Uh huh, uh huh

CONLEY: So once them mother fucker strike, then I do what I gotta do, I'm going um to see my people out in Iowa man you feel me. Unless I can pull a rabbit out of my hat out here and it save me a trip. For real, I ain't gonna lie, all I'm tryin to do is dump about 9, bout 9 joints you feel me. That ain't, like I said a lot of that ain't even got to do with, cause everybody, U/I, I cashed everybody else out but you, you feel me, everybody is doing what they doin you see what I'm saying.

UM-3592: Uh huh

CONLEY: So I'm like shit. But when they ready to score they be back around.

UM-3592: Right

CONLEY: They ain't even uh, (yawning), U/I, I, either fucked it off or got them a few little points and kept it moving you see what I'm saying. Like told 'em I said shit that's on you all you feel me

UM-3592: Defiantly on them

CONLEY: When you all call me it's for the high. You see what I'm saying. Like U/I

UM-3592: Right, right. It's one thing different between everybody else and me, I don't, I don't, I don't be in your head about nothing. I don't care what the denomination is.

CONLEY: Yeah

UM-3592: Know what I mean

CONLEY: Yeah. Like I said there's enough of it over there you feel me. I ain't Like I said I got two to three other line ups it don't like I said it don't affect me like it might affect the next person. You see what I'm saying cause I tell'em like nah bro, I'm going to stay in tune with something you feel me.

UM-3592: Right

CONLEY: Even if it's unrelated to what we U/I and all you see what I'm saying

UM-3592: I'm trying, I'm trying to see if my nephew what if U/I

CONLEY: Well shit um

UM-3592: That's what I'm trying to do. I'm trying to see how they react to it.

CONLEY: Alright. Well shit um I'm in Hebron right now and when I leave here and head back down I'll bring you uh a picture or two letcha check know what I mean.

UM-3592: Yeah

CONLEY: We can go from there you feel me and we just go. You might be able to save me a trip for real.

UM-3592: Alright okay

CONLEY: Cause I told them though, I'm tellin you the same thing after I clear the shelf of that you feel me, I ain't even going back that route for a while you see what I'm saying

UM-3592: Right, right, right, right that I'm saying me and you need to talk. I want to continue to go on what's what's trending. I don't want what's already in the air. Everything in the air man U/I

CONLEY: Yeah, so, I'll let you know as soon as I'm back down that way bro you feel me.

UM-3592: Alright.

63.     Based on my training and experience and knowledge of this investigation, I believe that Conley was telling the unknown male that he has drugs that are not being sold. Conley also complains that he had to go get "perks," which I believe to be Percocet, from the "store" himself. Conley also refers to "different divisions," which I believe to relate to different types of drugs. Conley indicates that he is waiting on "some jewelry," which as explained above, I believe to be a reference to methamphetamine. Conley also indicates that someone should pull up to his "crib" because "I ain't going nowhere I am at the crib, you see what I'm saying," which I believe to be a reference to **TARGET LOCATION 1**. Based on this conversation, I believe that Conley is continuing to use his residence at **TARGET LOCATION 1**to facilitate drug trafficking.

## TARGET LOCATION 2

63.     Throughout each interception period, Agents have continuously listened to and read several hundred phone calls and text messages between CONLEY and GILLIAM which lead agents to believe both individuals are engaged in an ongoing drug distribution conspiracy. As explained more fully below, agents have confirmed that GILLIAM resides at 5113 Paddock Road, Apartment B in Cincinnati, Ohio through various means, including physical and electronic surveillance as well as administrative subpoenas.

64.     On May 21, 2020, Agents intercepted a phone call between CONLEY and GILLIAM during which CONLEY asked GILLIAM the address where he was. GILLIAM responded via text "5113 Paddock," which is the address of **TARGET LOCATION 2.**

25

65.     On May 22, 2020, agents intercepted a call from CONLEY to GILLIAM during which CONLEY advised GILLIAM he was going to grab a bag of "oranges" there, which is believed to be **TARGET LOCATION 2**, and GILLIAM responded that he was there.  On May 23, CONLEY called GILLIAM, which is detailed below:

DG- Hello?

MC- Hey what's up?

DG - What's up brother?

MC - Hey. Hold On. Hey, what's that orange thing do?

DG- Did what it's supposed to do.

MC- I'm saying, I'm saying when you gave it to your people. What they say bro?

DG- It aint what they say, it's what I saw!

MC- (laughing) Say that again.

DG- It aint what they say, it's what I say! You remember the Flintstones? BAM BAM

BAM BAM BAM! You remember little dude. Bam Bam?

MC- Yeah (laughing). Both of them drop?

DG- Hey

MC- Damn bro. What color was that bro? That I gave you that did that?

DG- Singing "Aint No Sunshine"

MC- I was just telling bro, I aint said nothing. You just said it all. You feel me? Like, that shit gunsmoke.

DG- Yeah. stuttering

MC- Got me torn up. You feel me?

26

DG- I'm waiting to put "fat boy" back in rotation too.

MC- Alright. I'll hit you back in a minute.

66.     Based on my training and experience, the above-reference conversation was drug related. I believe CONLEY was asking GILLIAM about the effect of the "orange thing," which I believe to be some type of drug, and GILLIAM was relaying the drug had a dramatic effect on users when he exclaimed "BAM BAM BAM BAM BAM."

67.     On May 26, 2020, agents were attempting to conduct surveillance on the user of cellular number 513-952-2464, who was, at the time, believed to be GILLIAM, and has since been continuously confirmed throughout the investigation. At that time, agents had received a subpoena return from T-Mobile indicating the cellular number returned to Delbert GILLIAM of 8052 Hamilton Avenue in Cincinnati, OH. At approximately 3:33 p.m. on May 26, 2020, CONLEY called GILLIAM, and a partial transcript is as follows:

CONLEY:  You say you on Virginia

GILLIAM: Yeah, like right here going to "Muscle" house, right there on the corner. I'm right here.

CONLEY:  Little buddy about ready?

GILLIAM: He been ready. He done blew me up. I told him I didn't know what you was doing. So. Just told him what it was.

CONLEY:  See if he wants to do 30 cause there is 30 left.

GILLIAM: Alright let me call him back. Alright I told him there weren't but 20 left.

CONLEY:  Yeah tell him there is 30 left.

GILLIAM: Ok.

27

MC: Alright.

68.    At approximately 4:14 p.m. that same day, an agent observed a black male wearing all white clothing, a white hat, sunglasses, and reading glasses around his neck walking toward a vehicle near 4382 Virginia Avenue.  The agent and I believed the male to be GILLIAM, after we both again reviewed the picture taken by an agent.  On May 27, 2020, I reviewed the surveillance photograph alongside a driver's license photograph of GILLIAM, and confirmed the male in the surveillance photograph was GILLIAM.  Agents noted GILLIAM appeared to be performing some type of work inside the residence, particularly painting, but did not believe he resided there.  At approximately 4:38 p.m., GILLIAM texted CONLEY "4382 Virginia".  At approximately 4:53 p.m., GILLIAM called CONLEY and explained to him he was waiting at 4382 Virginia.  CONLEY stated he was on Virginia, and GILLIAM continued to explain to CONLEY where he was exactly.  GILLIAM then stated "You see me?  I got on all white."  At approximately the same time as the call, I observed a blue Chevrolet Malibu, which agents know to be Conley's personal car, slowly heading toward 4382 Virginia, and an agent subsequently observed the Malibu pull near the residence.  GILLIAM then walked out of view toward the vehicle, according to an agent, and the Malibu left the area.  Agents believe GILLIAM entered CONLEY's blue Malibu, and the two left the area together.  Surveillance was then terminated.

69.    On June 22, 2020, CONLEY texted GILLIAM, asking for his social security number.  GILLIAM responded with his social security number, further confirming my belief that GILLIAM was utilizing the telephone which Agents had identified as belonging to GILLIAM.

28

70.     On June 23, 2020, CONLEY called GILLIAM, and a partial transcript is outlined below:

MC: Hey you got any blues left?

DG: Yeah.

MC: Alot?

DG: Nope.

MC: Laughs

DG: Got 24 of them in there.

MC: 24, I'm fitting to go get some more.

DG: Yeah bro.

MC: I'll see you in a minute.

DG: Ok.

71.     It is my belief that when CONLEY referred to "blues," he was referring to a type of drug, likely in blue pill form.  GILLIAM then responded he had 24, and CONLEY stated he would get more and see GILLIAM shortly.  It is my belief CONLEY was inquiring about the number of "blues" GILLIAM possessed, and was leaving to acquire more to give to GILLIAM, likely at **TARGET LOCATION 2**, which is GILLIAM's residence.

72.     On July 8, 2020, agents received a subpoena return from Duke Energy relative to 5113 Paddock Road, Apartment B, Cincinnati (**TARGET LOCATION 2)**.  An agent observed the name on the active account for the aforementioned address is "Nosleep Janitorial LLC."  Also, listed on the response for "Alt Tel & Type" section was "(513) 952-2464," which is the phone number associated with Gilliam.  Agents were aware that "No Sleep" had previously

29

been referenced by CONLEY and GILLIAM in May, 2020. Particularly, on May 20, 2020, CONLEY texted GILLIAM "What address did we use for No Sleep," and GILLIAM responded "1942 Kentucky Ave. Cincinnati Ohio." Agents believe "No Sleep" was some type of LLC CONLEY and GILLIAM were attempting or did actually create. A search by the agent through the State of Ohio on July 8, 2020, for any businesses named "No Sleep Janitorial LLC" yielded no search results.

73.     On August 5, 2020, Agents intercepted a call between CONLEY and GILLIAM. Below is a rough excerpt from a portion of their conversation:

CONLEY: Alright, so that's garbage. I gotta get that. Bring all that trash, bro. Bring all that shit. Bring all that shit. Matter of fact, I'm fittin' to come get that shit. You know what I mean? And, um, man, I gotta fuckin', I'm waiting on them out there, so there ain't no use in sittin' around waiting on them. They gonna call when they get, it's gonna be six U/I, I'm so motherfuckin', my anxiety high as hell.

GILLIAM: Mine is too right now, bro. Like, it really is, like.

74.     I believe that CONLEY and GILLIAM were discussing a bad batch of drugs, possibly heroin, when CONLEY referred to something as "garbage", and that he was coming to get it. CONLEY and GILLIAM spoke again the same morning of August 5, which is detailed below:

GILLIAM: Hello.

CONLEY: Hey. You at the house?

GILLIAM: Yeah, how far you out?

CONLEY: I'm still at the house.

30

GILLIAM: Ah, shit. Ok, I'm waiting on you, then. I was supposed to be in, uh, over here in fucking, uh, U/I, fix this fence. Tree fell on this bitch fence, next to my little brother's house. And, uh, he U/I, so I'm gonna talk to this bitch. I'm getting ready to charge this bitch about 600 dollars to do this shit. She gonna be so mad, I'm gonna finish this shit so quick. I'm gonna charge this bitch about 600 dollars.

CONLEY: Can you leave it somewhere?

GILLIAM: Yeah, you just gotta get a key. Damn, I don't like that shit.

CONLEY: Yeah.

GILLIAM: Yeah, I'll leave it.

CONLEY: Alright, I'm fittin' to, I'm on my way, man.

GILLIAM: Ok, ok. Hey.

CONLEY: Yeah.

GILLIAM: I was gonna leave it, uh, U/I the garage door open.

CONLEY: Ok.

GILLIAM: It'll be in the chair. You want me to leave it, I'll just leave it in the chair. In the uh, garage.

CONLEY: Alright, that's cool. That's cool.

GILLIAM: Alright, bro.

75.     I believe during the preceding conversation, CONLEY and GILLIAM were arranging for CONLEY to pick up the "garbage" drugs referred to earlier, and that GILLIAM would leave the items in his garage sitting on a chair at **TARGET LOCATION 2**.  Shortly after the above conversation, CONLEY again called GILLIAM, which is detailed below:

31

GILLIAM: U/I

CONLEY: Can you, can you separate em' for me?

GILIAM: Yeah.

CONLEY: Cause I'm trying to take the ones that we, um, finished out back.

GILLIAM: Ok.

CONLEY: Just something to make me know that, that's the difference. You know what I mean?

GILLIAM: Right

CONLEY: Alright

GILLIAM: Alright

76. Again, I believe CONLEY and GILLIAM to be referencing drugs in the conversation above, particularly when CONLEY asks GILLIAM to separate the ones which they had "finished." I believe CONLEY was referring to drugs which GILLIAM and CONLEY has already mixed to be separated from that which had yet to be mixed, or "cut."

76. CONLEY and GILLIAM spoke again after the above-referenced conversations, and their conversation is detailed below:

CONLEY: U/I

GILLIAM: U/I

CONLEY: Say it again

GILIAM: I just left the house and U/I

CONLEY: Ok, shit, I'm fittin' to pulling up there in a minute

GILLIAM: Ok.

32

CONLEY: U/I

GILLIAM: Ok.

CONLEY: Alright

77. Shortly thereafter, GILLIAM called CONLEY, which is detailed below:

CONLEY: I got it

GILLIAM: What, bro?

CONLEY: I got it.

GILIAM: Ok.

CONLEY: I'll hit you back in a second.

GILLIAM: As-salamu alaykum

CONLEY: Walaikum salam

78. Shortly after the above-referenced communication interceptions, agents with DEA Cincinnati established surveillance in the area of **TARGET LOCATION 2.** An agent observed a white Ford van leaving 5113 Paddock Road, which is **TARGET LOCATION 2**. Another agent observed the registration plate on the Ford van, Ohio temporary registration, K442534. A registration check was conducted and the vehicle was found to be a white 2007 Ford Van registered to No Sleep Janitorial LLC, 5113 Paddock Rd, Cincinnati, OH 45237. Agents believe that Gilliam was in the van and had just left his residence at **TARGET LOCATION 2.** Shortly after the white van was observed, electronic surveillance of the black Dodge Charger that was being rented by Conley confirmed that the Dodge Charger was in the area of **TARGET LOCATION 2** around the time he informed GILLIAM "I got it," which I believe to mean that Conley had picked up the drugs from **TARGET LOCATION 2**.

33

79. An agent later observed CONLEY drive his Dodge Charger to another location in Cincinnati to meet with a man agents later identified through surveillance as Corinthians DAVIS. The agent observed CONLEY park the black Dodge Charger at the curb in front of 4668 Kirby Lane in Cincinnati. The agent observed CONLEY in the front passenger seat of a Nissan Rogue SUV with Indiana license plate. A black male driver, later identified as Davis, was observed in the Nissan Rogue. The agent saw CONLEY exit the front passenger seat of the Nissan Rogue and stand at the front passenger window continuing to converse with the male black driver. Agents then observed the Nissan Rogue pull away from the curb followed by CONLEY in the black Charger. Agents maintained surveillance on the Nissan Rogue. Agents continued to surveil the Nissan Rogue as it appeared to drive in a manner that led agents to believe that the driver was cognizant of law enforcement surveillance techniques. DAVIS became known to agents near the beginning of the investigation and is believed to be a potential co-conspirator of CONLEY. Based on the phone call interceptions and surveillance, I believe CONLEY picked up some type of drug from GILLIAM's residence at **TARGET LOCATION 2** on August 5, and subsequently met with DAVIS, likely either providing the drugs to him or speaking to him about them.

80. On August 14, 2020 at approximately 1:02 p.m., Conley called Gilliam, and based on that conversation, I believe that Gilliam continues to engage in drug trafficking and is likely still using his residence to assist in his drug trafficking. Below is a rough transcript of that conversation:

DG: You gettin ready to go aint you?

MC: Nah, nah. Not yet. (U/I)

34

DG: When I get back over here I'm going to call Duke, first I'm going to call Duke, then I'm going to have to go and pay it.

MC: Ok, ummm, check your little mans status on them blue cuz we gonna go back in Sunday. We going to go back in. Check your little people on the blues cuz we gonna go back to the store Sunday.

DG: I, I, I need em. I need em. I mean, I check the status, I need them mother fuckers.

MC: Alright, well I gotta put that order in, I gotta spend up the rest of that paper on Sunday. I told him I was going to do it this week so. Shimmy bout done, he ain't, he said he got bout 75, 70 left.

DG: Huhhhh?

MC: Yeah.

DG: That many left? Allll man. I thought you told me he only had 19 or 20 left.

MC: Bro listen, listen I'm going to excuse you because your mental all the way everywhere and I'm gonna take the weight for that cuz you said theres no way but I told you repeatedly since the beginning, I gave you the last ones that there was plenty of them over there for you.

DG: I didn't know I need them right now. Shit.

MC: You should of fuckin told bro while you was over there.

DG: Ahhhh, fucks. Goint to have to come back over here.

MC: Yeah, I'm glad, I mean for real I was really hopin them mother fuckers went before I left so I could of took care of that shit today and we would of been straight by Monday. You know everybody count doin what they doin, gotta be patient. You feel me?

35

DG: Right.

MC: It's over though.

DG: Hey, so was you comin over here?

MC: No, do I have to?

DG: Yeah, I think you stop by. These mother fuckers can't drive over in Kentucky. God Damn.

MC: You said you gonna need me to stop by before I leave?

DG: Yeah, stop by and uh stop by. I got some (U/I) for Shimmy. Something in there for Shimmy.

MC: Alright, I'm gonna umm. Alright bet, bet, bet. I got you.

DG: I'm waitin on you bro.

MC: My time is tight.

DG: I know bro, I'm going to call this Duke. And uhhh, yeah.

MC: Alright you got Ish, you got, you got his number, I'm gonna just tell him you that you come over and get about 20, 25 of them joints. You feel me?

DG: Yeah, I need.

MC: And then um, go from there. You know what I mean but I need them mother fuckers gone by this weekend.

DG: By the weekend?

MC: Hell yeah, yeah I need them mother fucker gone this week, I need all that count situated by Sunday.

DG: Ok.

MC: They already been sittin on a couple bands of mine, for about a week. You know what I mean? So it's like, and I told em I wasn't going to send less than seven. You know what I mean. So, I told him, shit he said he got 9, 9 there and he still waitin on a couple more. You know what I mean, so. So I'm like fuck that. Gotta get that shit out them mother fuckers about gone. You know what I mean.

DG: Sounds good. Alright let me ummm.

MC: Yeah, just call him, cuz we got (U/I). Just call him when you ready.

DG: Ok, alright, I got it bro.

MC: Alright.

81.     Based on my training and experience and knowledge of this investigation, I believe that when Conley tells Gilliam, "check your little mans status on them blue cuz we gonna go back in Sunday," Conley likely means for Gilliam to check to see if a dealer needs more "blues," which are believed to be a drug in blue pill form. Conley then indicates that he is getting more blue pills on Sunday. Gilliam confirms that he needs the pills. Conley appears to be annoyed with Gilliam because "Shimmy" had between 70 and 75 pills left, and Gilliam could have just gotten more from him. Conley then instructs Gilliam to get "them joints" from "Ish," which, is believed to be Keontaye Stokes at **TARGET LOCATION 3**. It is believed that Gilliam would likely return with the "blues" to his residence at **TARGET LOCATION 2**.

82.     On August 21, 2020, agents intercepted communication between CONLEY and GILLIAM which strengthened agents' belief that CONLEY and GILLIAM continue to engage in drug trafficking. The rough transcription is detailed below:

MC: I was going to have to go up that way anyway because Mike, Mike want to ride. He ain't got his L situation. He was going to show me the way but I mean god dammit. You know what I mean? I was like killin two birds with one stone. Drop Kandi and shoot with bro because I know they going to be tied up all night, you know what I mean? I was going to shoot that way. Try to dump umm, dump ol boy you feel me?

DG: Right, OK.

MC: U/I (possibly) still ain't doin nothin this way.

DG: Hey bra.

MC: Yeah?

DG: How close to the blue bonnets?

MC: I gotta send 45 more hundred. (audio broken)

DG: Your phone is fuckin up.

MC: I said I gotta send 45 more hundred.

DG: All.

MC: I gotta send 45 more hundred.

DG: Ok.

MC: 45 more hundred champ. Yes sir, 45 more hundros. Get that shit situated with them. I could've did something with my man, local, they scored. Nah, this what they did, they called me. They said they had a number, for the same rent, for the same ones for two points cheaper. But I had already went the route with "D" and then went the route with the sending the money I had already to dude and them.

DG: Right.

MC: So, I told uhh, "C" today, know what I mean? He could come get some of that, that's sittin over there.

DG: Right.

MC: Work his number, I said as far as them blues go I'm like 35, close to 4 bands out, so once I clear that with my powder source I'm be feeling alright you know what I mean. Cuz, I ain't gotta worry about all that other shit. Anyhow, Ish, wanted to go this weekend, but I told him they might as well keep that tree going until ummm, until. All, did you hear from Abdu?

DG: Yeah, did he call you?

MC: I don't know?

DG: He said he about to call you.

MC: I didn't talk to him. I think I, I got an Atlanta number but it might be my sister. I'm going to call it though. I didn't um, he got a new number?

DG: Yeahh, I got the old number. He called me from a couple numbers but uh, I think it's getting ready to be alright. But he was call, he said he was going to call me back.

MC: All Ok, ok, ok, ok, ok.

DG: And I heard from Zannie.

MC: You heard from Zannie? What he talkin about?

DG: He said how shit crazy up here and U/I. People. He just venting a little bit. Thats all.

MC: Yeah, what he have up his sleeve?

DG: All shit, tryin to put something together.

MC: He said putting something together?

39

DG: Yeah. What time you rollin out bro tonight?

MC: Umm, I'm going to get with Ish. U/I.

DG: Ok.

MC: Sit something down, check something out, U/I. He like shittt. U/I.

DG: All sit.

MC: So he been putting the one two together just in case mother fucker U/I. Dude did say 4 dollars. He said shit, 4 dollars with ease. He said after 4 dollars, he said everything else is to be negotiated.

DG: Ok.

MC: So I don't know, I'm going to size it up but my whole mission was to get with Mecci and them and just do what I do on old boy side man I'm tryin to collect my shells for that shit man. For real. I got about, I ain't no bullshit even if I gave it away it's still about 18 bands worth. If I gave it away it's still that. It's like mannn. U/I

DG: I'm sittin here resting my knee, my knee is fucked up. I'm chillin.

MC: Yo people satisfied?

DG: Yeah so far so good.

MC: Alright. U/I. Slow walk.

DG: That's what I'm doin.

MC: I mean for real, we ain't got other choices cuz everybody doin what we doin.

DG: Huh?

MC: I said we really ain't got no choices cuz everybody's doin what we doing.

DG: Man, bra, every, bra, everybody. That's just a week ago we couldn't do nothing now

everybody's mamma.

MC: That's how it be.

DG: I ain't trippin.

MC: Thats how it be. One week we do this the next week it's that.

DG: Yup, for sho.

MC: One weeks it's this, next week it's that.

DG: Some of this some of that.

MC: One week I told em, said we just had jewels, we just had jewels, they was screamin for uhh, ol boy. I went and got ol boy situated.

DG: Now everybody screamin for blues.

MC: But nah, it ain't even, but honestly if the blues would of went faster I could of, I would of went on back one time the other way with the blues for the half. But still could of had us some but shit. When i did, when I did ol boy and we still had almost 200 blues left. I'm like shit, gotta find some "D", some defense. Shit. Da Fuck? Is was it is man.

DG: Damn sure is.

MC: One thing for sure, two things for certain when I had all these blues. Cuz see this what I'm tryin to get bro and them understand too, like, see these blues have them profs, you feel me? Cuz it's a nicer quicker uh, tic toc. But it really ain't I wasn't really impressed with on it last go round. So it was like they going to have to pick back up and do whatever they gotta do a long with the other shit so I'm like mannn, before I even get trapped on that one again, I ain't doin that one, I'm going to make sure blues is secure on chump chump and I'm gonna mother fuckin keep it a little better, U/I around and trees

41

bro. For real thats the look. 2020, the rest of 2020. Just gotta connect the dot on trees I'll be alright, but for everything else I'm pretty much going to be secure. I'm hoping some jewelry pop up out of nowhere, because boy if that shit pop up out of nowhere I'm going to go coo coo for cocoa pops.

DG: I'm telling you god damn.

MC: Yeah, go crazy downtown, down south.

DG: Yup, yup you have a safe trip man.

MC: I'll hit you I just got, I just crossed back over to KY. Run to the house, check Shimmy pulse real quick. Probably going to leave late.

DG: That's a nice little ride.

MC: I'm gonna do the 3 there, 3 1/2 to the crib. Rest my neck. Get with bro. Stay at bro's crib tonight. Or wake up early about 6, 7, shoot 4 hours. Bounce over there holler at them knuckle heads.

DG: I wish I would've went there man probably would of changed my life.

MC: Yeah man I ain't never had nothing bad about Iowa. The only thing ummm that fucked me up about Iowa is man I had a big problem with big frank man. He opened the back door and mother fucker blew him down. We never knew, we never nobody never knew how that transpired.

DG: Right, that's the shit you hate. I waited on you to call me yesterday bro.

MC: For what?

DG: You said you was going to call us we was going to do that.

MC: Oh yeah, yeah I went and checked it out. Yeah, just went to the store too.

DG: Did he?

MC: Yup that's what he had 25 he had U/I 25's at the store. But, I went over there and gave him the test run right. Just a act. I pulled his pocket, I pulled his pocket and so give me this. I just wanted to see how he was going to respond but then he didn't. You feel me so I was like alright. He still know who's on what's what. Then I talked to him about what me and Nah Nah discussed. I wanted to see if he was going to lie. He ain't lie. Kept hat 100. He told me, he told me ummm. He told me flat out though like man like bro I've been trying to keep right without fucking with with the things and doing this that and third so it be kind of hard, I be kind of late and shit because my body still trying to adjust to you know what I mean. I said, yeah temptation a mother fucker you know what I mean. You gotta go to god sometime boy, I had to tell like the minute you go back bro taking everything away from you.

DG: Um hmm and longer.

MC: Your mama think, I'm telling now if your mama think or got a clue like she feel like you on that road to destruction boy guess what. He looked at me in my eyes and said I already know.  Yes nigga the boogie man coming boy. Just like your son go had to check in, guess what you gonna be checking in too boy. So we had a nice little rap. But yeah he had just in 25, he said I said that's whats up. He said I got that from you cuz, I said what? You always tell me to go all in bra or put it where it's supposed to be at so it won't get touched. You feel me? I said yeah, that's how I'm coming up I'm going all in, alright thats whats up. Thats how you do it. Shit, there ain't no use to short jab that mother fucker throw all that shit in the pot and let it go. I was happy to know, I was kind of

cheesing like he back to spending quarters at the store. That's whats up.  Hell yeah that's what's up. Hell yeah when he told me that I said bet. I said his people must be plain fed with him now, I hope so, I didn't want to get in his business, but he was like getting them. You know he be gettin those U/I and popping them for 50. So I said people might cut cuz some love at 25 on his first stack. Cuz I know he been tryin to get to about a thousand of them mother fuckers. Prolly just got through his first big bag, big bando, you know what I mean, on his own count. So it will be alright, figure it out. I know what he started with. He started with 750 dollars. Started with 750. Soon as he got out I gave him a couple dollars, couple dollars to put in his pocket, half them U/I mother fuckin U/I. Shit, he told me what he was going to do too. He said cuz I'm going to get at you in about 30. I gotta turn this a couple times. I said that's whats up champ. Thats what up, holler at me then. It's been about 5 month.

DG: Uh uh uh.

MC: It's that KY though. You know what I mean. That KY. KY a different type of U/I. That shits different. Then you ain't got to worry about so many mother fuckers clawin you out. That's what this shit is over here. But yeah, we prolly still going to be all systems a go. I could, I could all systems a go if but I don't know what's what now like I said he went to the debt.

DG: Ok.

MC: So he might of set the tablets somewhere else.

DG: Ok, alright.

44

MC: I'm not even going to send myself a blank one. Be a whole bunch of extra

materialistic shit just because. You feel me, just because.

DG: Right.

MC: Fuck all that shit. See whats up though. I'm pullin up on glock, I fin to holler at him.

See what's up. Shit I'll hit you in a minute.

DG: Alright.

83.     Based on my training and experience, particularly within this case, I believe the

preceding conversation between GILLIAM and CONLEY to be largely about drug trafficking

throughout the communication.  Particularly, GILLIAM asked CONLEY about "blue bonnets,"

which I believe to be a reference to drugs.  CONLEY appears to continuously talk about amounts

of money throughout the conversation, including when he responds to GILLIAM's "blue

bonnet" question by saying he needed to send "4500 more."  When CONLEY asks GILLIAM,

"Yo people satisfied?" I believe Conley is asking whether people are satisfied with drugs, and

GILLIAM responds, "Yeah so far so good."  The pair also seem to be discussing the ebb and

flow of demands for various drugs.  Given that surveillance and wire interceptions indicate that

GILLIAM has recently stored drugs in **TARGET LOCATION 2** and is presently engaged in

drug trafficking, I believe that drugs and evidence of drug trafficking are likely located in **Target**

**LOCATION 2**.

## TARGET LOCATION 3

84.     During the current investigation, Agents intercepted communication between

CONLEY and cellular telephone, 859-878-4715.  Through administrative subpoena service to T-

Mobile, agents learned that 859-878-4715 has a listed subscriber of Marquel Stokes.

45

Additionally, through physical and electronic surveillance, Agents noticed on multiple occasions, including in August 2020, that CONLEY travels to the immediate area of **Target Location 3.**

85.     On May 20, 2020 at approximately 9:11 p.m., agents intercepted a call between CONLEY and cellular telephone, 859-878-4715. During the communication, agents learned the male using 859-878-4715 was on an "anklet," which agents know to be a home incarceration device/gps tracking device commonly monitored through courts, detention centers, and probation and parole.

86.     On May 21, 2020, an agent contacted District 7 Probation & Parole Officer Eric Heck for information regarding Marquel Stokes. Officer Heck advised Marquel Stokes was not on electronic monitoring, but his brother, Keontaye Stokes, was placed on electronic monitoring on May 11, 2020. Officer Heck advised that he had placed the monitoring device on Stokes. The agent inquired if Officer Heck gained any other information from Stokes. Officer Heck stated Stokes provided him with cellular telephone number, 859-878-4715 and an address of 357 East 16th Street Apt #1, Covington, Kentucky **(TARGET LOCATION 3)**. Furthermore, Officer Heck advised that Officer Bayless had contacted Stokes utilizing 859-878-4715 earlier in the morning of May 21, 2020.

87.     On May 21, 2020, Agents intercepted the following text message communications between 859-878-4715, 859-206-7091, and Conley. The following is an excerpt of that exchange:

> 859-878-4715: Bro im bout 2 change this line imam call or text f the new
> Conley:  ✋
> 859-206-7091: Salam alaikum this the new line bro this ish
> Conley:  Okay

Conley: Buddy ready

Conley: Headed to you

859-206-7091: Alright my peoples red here right now

Conley: I'm tryna kill two birds with one stone…meet me by the store

859-206-7091: Ight let me kno when u outside

Conley: Bring a ball

Conley: The brown one

859-206-7091: Of oh girl or tree

Conley: Ole boy

Conley: I'm at the store

859-206-7091: Ight

Conley: Yoooooo

Conley: I have seen you come out twice where you go

859-206-7091: Here come bro

88.     Based on my training and experience and knowledge of this investigation, I believe Stokes was texting Conley his new telephone number. The two then arranged a meeting, which I believe to be drug-related. Specifically, Conley's reference to "ball" and "the brown one," are references to drugs. The two then appear to have arranged to meet to exchange drugs.

89.     On May 23, 2020, Agents intercepted the following text message communications between, CONLEY and 859-206-7091, which, as explained above, was believed to be used by STOKES.

Conley:  As salaamu alaykum beloved

Conley: How's the brother

Stokes:  Walakium salam bro i ain doin nothin right here wit jax prolyl bout 2 take 20min nap

Conley: Ishallah everything is everything, do we need to grab some beans and was you able to get the greens from the old man

47

Stokes: Im bout out i seen him this morning but i was talkin 2 my lil bro mom but im bout 2 call him

Conley: Okay just hit me when you get situate…imma line a few things up… send me a count on the erky and I will put the order in for those as well if needed…

Stokes: 29

Conley: Ok we cool ova there unless you wanna send something to the store to get more but I think we cool

Conley: Do you wanna feed the dogz or they cool…jlmk

Stokes: No rush bro im tryn get everything gone then do the math

Stokes: I got lil bit of fetty n that brown n that new shit

Stokes: I a touch the orange soda yet

Conley: Sounds good…but yo count right in front of you… it's just not that kind that literally folds…but take your time, imma grab that orange…

Stokes: 4 sure jus so i will kno what im puttin up cause i got the tree the eatables n erky n ol dude

Conley: Factz

Conley: You running a store

Conley: 😊😊😊

Conley: Businessman… lol back down like smack down

Conley: You betta be ready to get them L's this week…

Stokes: 😊😊😊 some like that jus tryin b like u bro im so locked n on this bag i barely sleep but fuck it

Stokes: I kno i need 2 start studying 4real

Conley: It's on I'm gonna stop down and grab something to smoke and let me get 4 erky imma take those to my ppl in Dayton

Conley: I'm omw now

Conley: Right around the corner

Stokes: Ight get it ready now

Conley: Just a dub

48

Stokes: On tree side

Conley: Yeah

90.     Based on my training and experience and knowledge of the investigation, I believe the above text message exchange is drug related. Conley appears to be checking Stokes's drug inventory and was arranging to exchange drugs. The reference to "brown" usually means heroin. The reference to "orange" is also likely a reference to a drug. In context, it appears that Conley knows where Stokes is located without asking, and thus, it is reasonable to infer that Stokes was at his residence at **TARGET LOCATION 3.**

91.     On June 9, 2020, Agents established surveillance in the area of **TARGET LOCATION 3.** Agents were anticipating Stokes leaving the residence in order to appear in Kenton County District Court for an arraignment hearing for a pending felony possession of controlled substance case, Kenton 20-F-00705, at 08:31 AM in room 1A.

92.     At approximately 7:59 a.m., an agent contacted Kentucky Probation and Parole Officer Eric Heck in regards to the current location of Stokes, per the GPS monitoring device outfitted and monitored by Probation and Parole. Officer Heck advised that the device placed Stokes at his residence.

93.     At approximately 8:26 a.m., I observed a gray Dodge Charger bearing Ohio registration, HXA3187 pull to the southwest corner of Maryland at E. 16th Street. At approximately 8:30 a.m., the agent observed an unknown black male and a black male with dreadlocks wearing a dark color t-shirt and blue jeans (later identified as STOKES) appear from **TARGET LOCATION 3.** Both males stood near the front of **TARGET LOCATION 3** and then went out of sight.

49

94.     At approximately 8:37 a.m., an agent was notified by Officer Heck that STOKES's monitoring device placed him at his residence. At approximately 8:40 a.m., An agent spoke with Officer Heck about STOKES's scheduled court appearance. Officer Heck advised he would check the monitoring device system again. Officer Heck advised there was a "delay" and the device now placed Stokes in the area of E. 13th and Pleasant Street.

95.     At approximately 8:43 a.m., believing that Stokes was en route to court, agents established surveillance in the area of the Kenton County Justice Center, 230 Madison Avenue, Covington, KY. An agent was on foot in the area. At approximately 9:06 a.m., another agent advised the agent that STOKES's monitoring device placed him in the area of 3rd and Court Street.

96.     At approximately 9:25 a.m., an agent observed the black male with dreadlocks wearing a dark color t-shirt and blue jeans, and dreads exit the Dodge Charger along with another unidentified male. The black male with dreadlocks wearing a dark color t-shirt and blue jeans walked toward the entrance of the Justice Center. An agent observed a phone in the black male's right hand while he was walking. I also observed the black male walking to the front entrance of the court house, and recognized him as STOKES.

97.     At approximately 9:26 a.m., agents arranged a "cold call" to the black male. Utilizing a covert telephone number, agents called cellular telephone number, 859-206-7091. The telephone call went to voice mail after two rings. I observed Stokes appear to manipulate the cell phone while waiting while waiting.

98.     At approximately 9:27 a.m., agents conducted a second "cold call" to 859-206-7091. The phone rang and a male answered the phone and said "Hello" twice. I observed the

black male with dreadlocks place a cell phone to his ear as if he was answering a phone call and appear to say something, then put the phone down. Based upon the activities and observations of agents, along with previously intercepted communications, I believe that Stokes was using the cellular telephone number, 859-206-7091.

99. On June 10, 2020 CONLEY texted STOKES, saying "I need to come grab 20 blues." I believe "blues" was a reference to some type of drug, and CONLEY needed to get 20 dosage units from STOKES at **TARGET LOCATION 3.**

100. On June 11, 2020, CONLEY called STOKES, and the conversation is detailed below:

MC- What's up good looking

KS- Shit charging up that damn box

MC- I see everybody in front of the house.

KS- shit man (inaudible) I told them little Niggas that they got to go

MC- ah nah they look like they just chilling, they ain't doing too much they could try and come in.

KS- inaudible

MC- but, they didn't even notice that I pulled up, like they, like they they be all the way all d(laughs) like Gotti didn't see me pull up or nuthin. I'm right on the corner type shit (laughs). That Nigga get a hot (U/I)

KS- yeah you doing alright

51

MC- yeah yeah I ain't doing shit I'm gonna um let me give you this what I got cause I'm getting on that road in the morning. Let me give you some of this thing to hold you through the week. Here I come

KS- alright

101.     Based on my training and experience, I believe CONLEY was informing STOKES he was going to bring him some type of drug to STOKES's residence at **Target Location 3** because CONLEY was going out of town. CONLEY stated the suspected drug would hold STOKES "through the week."

102.     On June 17, 2020, CONLEY called STOKES, which is detailed below:

MC: Any rockers down there?

KS: I think I got 15-20 left, about to go to court. I sold like 50 of them yesterday.

MC: Your ass make everything disappear don't you.

KS: I got to, the whole point of the system.

MC: You on your way to court?

KS: Yeah, 1:30 pm.

MC: Alright, keep me posted. Just wanted to see if you had some laying around, more than that though.

KS: I sold a whole jar as soon as I got back. Whole 100.

MC: Thats whats up. Laughs.

Subjects continue to talk about selling shoes, woman, etc.

MC: I took 2 of them joints and turned it into 3.5 straight presses so we have that in the cut, we still on standby with the u-digs, I was just thinking when they do come back around we going all in on them cause I have the other thing already active. We loaded on the other thing. So everything going to go to the store on that.

KS: You have old girl coming too right?

MC: Yeah, yeah.

KS: I told me people, you going to have to switch it up. They ask for that too, they like both whats coming. I may have rest of them gone today. Just waiting.

MC: I was just talking to bro, after we broke down the fractions and the math of it, the best number they can do is $3.25. Which makes it $3.00 all the way out. So, I told them, I don't see a point not being a problem because they don't know whats going on, on my end. They said they just wanted to get a confirmation on the number and we going to let you known whats what in the next couple hours. Right now the only avenue I see us powering up in and not having it all the way locked in on our own accord is on them blues. I really do got one but I'm going to holler at him once I got this gury and other shit set up. In the mean time I am just going to support little bro and the thing that they got going on. But when they come back around, we just spending everything we got with them, that way we just have them in inventory and we don't even have to worry about blues. Then shit everything is clock work. Try to take 8-9 bands over there straight at the gun.

KS: I'm trying to have that at least myself. Laughs.

MC: I'm just going to match what you come with. But its going straight, everything going to blues because we have everything else. When I come get some paperwork....

KS: I'm trying to have that to go... You know what I mean.... I'm all in.

MC: People don't trust the process. Why wouldn't it work if you built it.

KS: Its been working, same process you been doing God damn.

MC: Exactly, you just got more. I told bro once you got your number situated, I still owe them like 1200, he aint tripping, he aint even, thats where the last 60 came from. He said take'm bro. So i told him when them motherfuckers come back around, I'm trying to come with 9-10 thousand myself. I went to a lot of them fuckin johnnies, all the ones you went through and all the motherfucking 1500s, 25 1500s I sold.

KS: At least 5000-10000, least about 5.

MC: At least 25-3000 pills. Thats a lot of GOD damn beans, rockers, not rockers. (?)..... I

53

said shit they could come 2, 4, 6 thats 3, 6, 8 thats 4 honchos, 10, 11, 12, 13 just to play

with in that lane. I'll go spend 10, 11, 12, 13 in that lane (?) ..... Put a little joint in. Let

me know how court turns out.

KS: I'm ready for real.

MC: Just hit me. I'll pull down on you later.

103.　It is my belief that the preceding conversation was drug related. CONLEY

specifically refers to slang for drugs, such as "beans" and "blues," and discusses specific

numbers, including several thousand of some type of pills. STOKES also discusses his drug

inventory, which I believe to be referring to his inventory at TARGET LOCATION 3. STOKES

also discusses selling drugs quickly. STOKES indicates that he is "Ready for real," which I

believe to mean ready for more drugs.

104.　On July 1, 2020, Agents intercepted communication between CONLEY and

cellular telephone number, 513-828-2950, believed to be utilized by Michael CHANDLER. At

approximately 9:17 a.m., CONLEY texted CHANDLER, "If you wanna grab some blues today

you need to get with me before I go to the store." Based on my training and experience and

knowledge of the investigation, I believe "blues" to be a reference to drugs likely in blue pill

form. At approximately 11:38 a.m., CHANDLER texted CONLEY, "Need blues." At

approximately 11:43 a.m., CHANDLER called CONLEY. Below is a partial transcript of their

conversation:

CONLEY - Yo.

CHANDLER - Yo.

CONLEY - (U/I)

CHANDLER - I can barely hear you bro. Bro.

CONLEY - Yo, what's up bro?

CHANDLER - Ugh.. I could barely hear you bro, ugh.. yeah I need some of them. I need like 50.

CONLEY - Umm.. I'm at the house.

CHANDLER - Alright.

CONLEY - Just waitin, just waitin on bro to hit me.

CHANDLER - Alright, I got to get dressed and shit man, hop in the shower and shit real quick but I got the money here.

CONLEY - That's what I'm fixin to do now. I'm doin the same thing so just hit me when you're out the shower.

CHANDLER - Alright.

CONLEY - Alright.

105.    At approximately 12:23 p.m. that same day, CHANDLER called CONLEY.

Below is a partial transcript of their conversation:

CONLEY- Yo.

CHANDLER - What's up bro, yeah, you check, you check the time.

CONLEY- You ain't got no, umm.. your good smoke over there?

CHANDLER - I got a little left, I got some.

CONLEY- Damn (U/I), I'm out.

CHANDLER - I been sellin the shit out of that shit.

CONLEY- Shhhh, you got umm..

CHANDLER - Got enough to (U/I), I'm sellin outta all this shit man, I'm about to go get me some more today.

CONLEY - Got some strong shit?

CHANDLER - Ugh, (U/I) not with me bro.

CONLEY- You headed this way now?

CHANDLER - No I'm waitin on her to get umm.. get her (U/I). Oh yeah, she ready, yeah we about to walk out this door.

CONLEY- Alright bet. I'll be on the front porch.

55

CHANDLER - Alright.

CONLEY- Alright.

106.     Agents established surveillance in the area of **Target Location 1** for the meeting

between CONLEY and CHANDLER.  At approximately 1:03 p.m. on July 1, 2020, an agent

observed a dark blue Ford Taurus bearing Kentucky registration, 394ZPD arrive in the area of

CONLEY's residence.  At approximately 1:04 p.m, an agent intercepted the following

communication between CONLEY and CHANDLER.  Below is partial transcript of their

conversation:

CONLEY- Yo.

CHANDLER - Where you at, the front or the back?

CONLEY - Umm.. I'm on the back, hold on, I'll be out there I'm coming out on the
front.

CHANDLER - Alright.

CONLEY - I'm comin to the front.

CHANDLER - Ok

107.     At approximately 1:05 p.m., an agent observed CHANDLER, who Day identified

based on a comparison to a prior photo of CHANDLER, exit the passenger side of the dark blue

Taurus.  CHANDLER was observed walking on to the porch of CONLEY's residence. A brief

time later, another black male, later identified as CONLEY, arrived on the porch.  At

approximately 1:13 p.m., CHANDLER walked off the porch and back to the dark blue Taurus.

an agent observed CHANDLER to retrieve an item, possibly an iPad, from the passenger side.

At approximately 1:25 p.m., the agent observed CHANDLER walk off the porch and CONLEY

went inside his residence.  The blue Taurus then left the area.  I believe that Chandler was either

picking up blues or dropping off another drug, possibly marijuana, at **Target Location 1.**

108. At approximately 1:54 p.m. still on July 1, 2020, agents were monitoring electronic surveillance devices and determined that the black Dodge Charger, which was being used by CONLEY, was traveling away from CONLEY's residence. At approximately 1:57 p.m., an agent observed the black Dodge Charger parked near the southeast corner of East 16th Street and Maryland Avenue, Covington, Kentucky, which is the intersection where Stokes's residence at **Target Location 3** is located. An agent, who was conducting physical surveillance near **Target Location 3**, observed CONLEY a short distance away from the black Dodge Charger talking to STOKES and two unidentified black males. The agent observed STOKES sitting on the steps to **Target Location 3**. Agents continued to surveil the area of East 16th Street and Maryland Avenue. At approximately 2:25 p.m., an agent observed CONLEY to be holding a black bag and meet with an unknown male on the corner of East 16th and Maryland, near **TARGET LOCATION 3**. At approximately 2:26 p.m., an agent observed CONLEY place the black bag in the passenger side of his black Dodge Charger. Based on my training and experience, this activity is consistent with drug trafficking.

109. At approximately 2:32 p.m., an agent observed an unidentified white male exit **TARGET LOCATION 3** and converse with CONLEY for approximately twenty seconds before leaving the area. At approximately 2:33 p.m., the agent observed CONLEY walk to the black Dodge Charger. The agent noted that approximately five to six unknown males entered and exited **Target Location 3** in a period of approximately ten minutes. At approximately 2:36 p.m., the agent observed CONLEY and STOKES talking on the corner. At approximately 2:40 p.m., the agent observed all the males standing/congregating outside to enter **Target Location 3.** At approximately 2:44 p.m., the agent observed CONLEY enter his black Charger and leave

shortly thereafter. Again, based on my training and experience, this activity and movement of persons is consistent with drug trafficking.

110. On August 2, 2020, at approximately 8:15 a.m., Conley texted an unknown number "I'm bout ready to reload for next…it's still some blues over there with Isha.. I think I found some foods I'm going to check it out after I get the folks out west situated today." Based on my training and experience and knowledge of the investigation, I believe reference to "blues" is likely a reference to a drug in blue pill form. I believe Conley was telling the unknown person that "Isha," which I believe to be a nickname for Stokes based on Stokes's use of the name in other messages and other information from the investigation, still had some blues left. Thus, I believe Stokes likely was storing "blues" at **TARGET LOCATION 3.** That same number later texted Conley, "Need those b b," Conley responded "What's bb," and the same number said "blue," which again is believed to be a drug in blue pill form.

111. On August 7th, 2020, Agents established surveillance in the area of **Target Location 3** to conduct a controlled buy of methamphetamine from Earlie MITCHELL by using a confidential source. The confidential source was cooperating in hopes of receiving judicial consideration. MITCHELL was previously identified by agents as suspected of being part of the Marocko CONLEY drug trafficking organization. At approximately 11:05 AM, an agent established surveillance of the front of **Target Location 3.** At 11:08 AM, an agent observed four unknown black males in front of the location on the corner of Maryland Avenue and East 16th Street, near **Target Location 3**. One subject in particular was sitting on the front step of **Target Location 3**, rolling what appeared to be a marijuana joint. The males were seen passing

58

the joint around throughout the surveillance. One unknown subject was also observed going in and out of the front door of **Target Location 3.**

112.     At approximately 11:28 AM, an agent served STOKES walk out of the front door of **Target Location 3**. At 11:32 AM, the agent observed one of the unknown black males conduct a hand to hand transaction through the front driver window of a Volkswagen CC passenger car, black in color. The car pulled up on Maryland Avenue and stopped. The unknown male utilized counter surveillance techniques prior to approaching the car and completing a hand to hand exchange. At one point, there were at least eight different unknown males on the corner of East 16th and Maryland. STOKES was then observed going back inside the front door of **Target Location 3**. At approximately 11:34 AM, the agent observed STOKES come back outside the residence and get into the passenger seat of a Ford passenger car, grey in color. The driver of the vehicle was the other unknown black male that was observed coming and going from the front door of **Target Location 3**. The vehicle then left the area.

113.     At approximately 11:45 AM, an agent observed another unknown black male conduct a hand to hand transaction through the passenger window of a white passenger car. The white passenger car also parked on Maryland Avenue for a short period of time and left right after the hand to hand was complete.

114.  At approximately 11:46 AM, agents observed an older black male walking east on 16th street and turn the corner heading south on Maryland Avenue, near TARGET LOCATION 3. An agent then observed the black male meet the confidential source before walking out of his sight. The source then conducted the transaction of approximately one ounce of crystal methamphetamine with MITCHELL. At 11:47AM, an agent observed the male returning north

59

on Maryland and start to make the turn back west on 16th street. The agent utilized binoculars and positively identified the person as Earlie MITCHELL. The observations by the agents confirmed the transaction was between the confidential source and MITCHELL. Investigators then left the area.

115.    The number of persons entering and exiting **TARGET LOCATION 3** and the multiple exchanges near **TARGET LOCATION 3** are consistent with drug trafficking.   Given the multiple intercepted conversations indicating that Stokes has been engaged in drug trafficking, other indications that Stokes has used his residence to store drugs, and the recent activity near **TARGET LOCATION 3** that is consistent with drug trafficking, I believe that Stokes is continuing to traffic drugs and that evidence of drug trafficking will be found in **TARGET LOCATION 3.**

116.    Presently, agents have again confirmed through Probation that STOKES continues to reside at **Target Location 3.**

## TARGET LOCATION 4

117.    Throughout the investigation, agents have intercepted phone calls between Michael CHANDLER and CONLEY which lead agents to believe CHANDLER is engaged in an ongoing drug trafficking conspiracy with CONLEY et al.  Additionally, agents have confirmed CHANDLER stays at 4254 Berrywood Drive, Apartment #4 in Independence, Ketucky (**Target Location 4**), through physical and electronic surveillance as well as a controlled purchase by F.B.I.

118.    On June 22, 2020 at approximately 10:14 p.m., agents with the FBI used a confidential source to purchase approximately 7 grams of suspected heroin from CHANDLER

60

for $800. The FBI source was cooperating in hopes of receiving judicial consideration, and I believe the FBI source to be reliable. The FBI source was given and extra $200 to pay for an old drug debt that he/she owed to CHANDLER. The confidential source gave statements against his interest because he/she admitted to previously purchasing drugs from CHANDLER and to paying CHANDLER for drug debt with a firearm. The confidential source also cooperated in the investigation and made admissions that were consistent with officer observations. The FBI source has a number of arrests and convictions for both misdemeanors and felonies. His/her prior convictions include, but are not limited to, multiple convictions for drug possession, disorderly conduct, resisting arrest, promoting contraband, drug trafficking, and tampering with evidence. The meeting between the confidential source and Chandler took place in the Independence area. FBI agents searched the confidential source for contraband prior to the controlled buy and did not locate any. FBI agents also equipped the controlled source with audio and video equipment for use during the source's meeting with Chandler. After the recorded meeting with Chandler, agents recovered 7 grams of suspected heroin from the confidential source. CHANDLER was driving a blue Ford Taurus during the transaction, which agents followed after the drug purchase, to 4254 Berrywood Drive, Apartment 4 in Independence, Kentucky, which is **TARGET LOCATION 4.** Agents were able to observe CHANDLER enter the door associated with **TARGET LOCATION 4** after the Taurus arrived near the location.

119. On the same day, at approximately 6:30 p.m., a few hours before the above-described controlled buy, CHANDLER accidently texted CONLEY "Im getting the rest of the cash on deck and it 200 a ball all the way out 1600 a zip." I believe this to be the price of an 1/8 ounce and an ounce of a drug, respectively. CHANDLER then quickly texted CONLEY "Not

61

meant for u," indicating he the initial text message was accidental. The following text message exchange then occurred:

CONLEY: You crazy

CONLEY: I'm at the crib

CHANDLER: I gotta get rest of cash bro

CONLEY: I'm at the crib

CHANLDER: K

120. At approximately 8:25 p.m., shortly before the above-described controlled buy, the following text message exchange occurred:

CONLEY: Last call for alcohol…. I got to go back down there

CHANDLER: I want a half for sure

CONLEY: Imma grab it…750 if I buy it bro… I'm bout to put this together and I'm out how long you gonna be

121. Based on my training and experience and knowledge of this investigation, I believe CONLEY was picking up or purchasing drugs and then quoting CHANDLER a price. At approximately 8:54, shortly before the above-described controlled buy, CHANDLER called CONLEY. Below is a rough transcript of that call:

CONLEY: Yo

CHANDLER: what's up bro

CONLEY: anything new what's the word?

CHANDLER: shit, I'm waiting on dude at ah Fuller here. I'm over here. I'm need me (untellable) coming to me cause this fool.

62

CONLEY: alright I'm gonna grab this joint.

CHANDLER: huh?

CONLEY: I'll grab it

CHANLDER: alright thank you bro

CONLEY: yo

122.    Based on my training and experience and knowledge of the investigation, I believe the above-conversation is a reference to CHANDLER waiting on someone who is purchasing drugs, and CONLEY indicates that he is grabbing something, which I believe to be drugs, for CHANDLER.

123.    At approximately 9:12 p.m., about an hour before the controlled drug purchase described above, CHANDLER told CONLEY via text message that he was "30 mins out." At approximately 9:12 p.m., CONLEY texted CHANDLER "Headed back to the house." At approximately 9:31 p.m., CHANLDER texted CONLEY "Ok there 20 mins out," and "On way." At approximately 9:40 p.m., CONLEY texted CHANDLER "I'm on the porch." Based on my training and experience, and knowledge of this investigation, I believe that CHANDLER was going to CONLEY's residence in Covington to pick up drugs prior to his meeting with the controlled source. Given that CHANDLER appears to have stopped by CONLEY's house a few minutes before the controlled buy, I believe that CHANDLER was likely picking up some or all of the drugs he sold to the confidential source.

124.    On June 30, 2020, Agents intercepted a call between CONLEY and CHANDLER, which is outlined below:

CHANDLER - Yo.

63

MC - I'm down here..

CHANDLER - Hello

MC - I'm down here on 16th man, I'm, Imma umm.. you might as well take that (U/I) go to the store with it.

CHANDLER - Huh?

MC - I said you might as well take it..

CHANDLER - What you say?

MC - I said you might as well take that to the store.

CHANDLER - I (U/I) I can (U/I) to, I just needed them ASAP, they killin my phone.

MC - I like how y'all be tryin to put that shit on my, on me.

CHANDLER - (laughs) (U/I)

MC - Man, I don't give, hey I don't give a fuck about them killin your phone. I ain't even makin that priority. (laughs)

CHANDLER - I know bro.

MC - For real, I'm just doin it now because I got a little time these motherfuckas don't answer in the next 15 20 minutes, you can forget about it. You know what I mean.

CHANDLER - Right. Alright.

MC - I be tellin y'all about that shit bro, y'all be penny pinching.

CHANDLER - I was tryin to buy em yesterday. I been tryin to buy em since, you feel me the shit you left out, shit, that shit helped a lot shit I was gonna buy my own. I was just tryin to see when you was goin to the store. That's what I was sayin yesterday.

MC - You probably gonna have to, I mean, see that's the thing bro. I don't know so it ain't no, you know what I mean.

CHANDLER - Right

MC - I just (U/I) you feel me.

CHANDLER - Yeah.

MC - And when he give me a call (U/I).

CHANDLER - Shit, I ain't trippin, shit, it's over, it's over shit, I just tell em it's over for a minute shit.

MC - Alright

CHANDLER - (laughs)

MC - I'll let you know as soon as I hear something, you know what I mean.

CHANDLER - Alright bro.

MC - Alright

125.    Based on my training and experience with this case, I believe the above conversation to be related to drug trafficking.  I believe CHANDLER is informing CONLEY he needs drugs quickly when he says "I just needed them ASAP, they killin' my phone" because a third party or parties are attempting to get some type of drug from CHANDLER.  Following this particular call, CONLEY texted CHANDLER "Think I got you those 25 blues," which I believe to be a reference to drugs.   When CHANDLER tells CONLEY that he is down on 16th, I believe him to mean that he is near **TARGET LOCATION 3**.

126.    On July 1, 2020, CHANDLER called CONLEY, the conversation is outlined below:

MC - Yo.

CHANDLER - What's up bro, yeah, you check, you check the time.

MC - You ain't got no, umm.. your good smoke over there?

CHANDLER - I got a little left, I got some.

MC - Damn (U/I), I'm out.

CHANDLER - I been sellin the shit out of that shit.

MC - Shhhh, you got umm..

CHANDLER - Got enough to (U/I), I'm sellin outta all this shit man, I'm about to go get me some more today.

MC - Got some strong shit?

CHANDLER - Ugh, (U/I) not with me bro.

MC - You headed this way now?

CHANDLER - No I'm waitin on her to get umm.. get her (U/I). Oh yeah, she ready, yeah we about to walk out this door.

MC - Alright bet. I'll be on the front porch.

CHANDLER - Alright.

MC – Alright

127.    Based on my training and experience, I believe the above-outlined conversation to be drug related.  Specifically, I believe CONLEY was asking CHANDLER if he had "good smoke", or marijuana, at his residence, which is **TARGET LOCATION 4**, and CHANDLER said he had a small amount left because he had been "sellin the shit out of that shit," and needed to get more.  CONLEY later asks if CHANDLER was headed his way, and CHANDLER stated

66

he was getting ready to "walk out this door." I believe it's reasonable to infer CHANDLER was leaving **Target Location 4** when he was walking "out this door." Additionally, CHANDLER indicated that he was "about to get some more today," which I believe to mean get more marijuana that he would likely store in **Target Location 4**.

128. On August 16, 2020, CHANDLER and CONLEY spoke multiple times via phone call regarding CONLEY directing CHANDLER to go to 16th Street, which is believed to be **TARGET LOCATION 3**, to pick up drugs. Those conversations are detailed below:

CHANDLER - Um

MC - Blues? Blues?

CHANDLER - Yeah. The dude I be paying said set him up the other day, so I'm a run it up with him real quick.

MC - Go pull up on 16th

CHANDLER - Nigga I aint even dressed.

MC - When you pull out, pull up on 16th. I'm a holler at lil bro and have him come out and holler at you.

CHANDLER - Alright

MC – Alright

CHANDLER- Hey, what you want me to do with the paperwork?

MC - Keep the money, I mean keep the paperwork over there. I'll get it later.

CHANDLER - Alright

MC - Just pull up. When you move out, just pull up so I can call bro and them tell them what's goin. You know what I mean?

CHANDLER - I think, I think I still got his number. What's his name? I still got his number.

MC - That's that's um Ish [STOKES's] house. That's Ish house

CHANDLER - Damn. What did I save his name? (Laughing)

MC - Shimmy? You saved it under Shimmy

CHANDLER - Did I?

MC - I don't know bro. Just let me know when you move over there.

CHANDLER - Alright. I got you.

CHANDLER and CONLEY spoke again after the call above, which is detailed below:

CHANDLER - No not yet. I'm about to in a few.

MC - You got Ish's (STOKES) number?

CHANDLER - Nuh uh

MC - That's the number you need. You was asking for Bam. You was asking for Bam, you need Ish number.

CHANDLER - Um, I got Bam number

MC - Alright. If you can talk to Bam, you can talk to Ish. You get a hold of Bam?

CHANDLER - I only got one of the numbers though.

MC - Oh okay. Alright. Um. I'm finna to send you Ish number. Just drop that little paperwork off on him. He got that thing waiting on you too.

CHANDLER - Alright

MC - Alright, I'm finna have him call you.

129.    I believe CONLEY was directing CHANDLER to go to see STOKES at **Target Location 3**, particularly saying "Just drop that little paperwork off on him. He got that thing waiting on you too." Paperwork is a reference to money, and "that thing" I believe is a reference to drugs in this context. CONLEY is therefore telling CHANDLER to drop off money to STOKES and pick up drugs from **TARGET LOCATION 3.**

130.    CONLEY and CHANDLER speak again about 16th Street, which is detailed below:

CHANDLER: What's up, bro?

MC: What up, doh?

CHANDLER: I just dropped that U/I off.

MC: Yeah, he told me they wasn't no more blues left.

CHANDLER: Yeah, I was like damn.

MC: Did you see the green?

CHANDLER: Yeah, I got some.

MC: Was it U/I? Was it good?

CHANDLER: I don't know. I just had got it. It's Gorilla. It's something Gorilla Glue, or Glue something, and some Girl Scout Cookie.

MC: Alright, alirght. so it land, it landed, it's cool. I was just trying to make sure it landed.

Alright. Cause he was trying to tell me, I'm like bro I'm in a funeral bro, like I can't talk right now, you know what I mean?

CHANDLER: Right.

MC: Um, shit, I'm about a hour out. I'm gonna put them orders in for the blues tomorrow.

CHANDLER: Alright.

MC: Yeah. I'll put them in tomorrow.

CHANDLER: And I'm just gonna sit back U/I. Ah, yeah, I'm gonna have to wait. How many days you think it'll be? Like three?

MC: What's that, for the blues?

CHANDLER: Yeah.

MC: Um, if I get it out tomorrow, bout Tuesday, Wednesday.

CHANDLER: U/I

MC: Yeah, bout Tuesday, Wednesday, but I gotta get out. See I'm on my way, I'm about a hour out now.

CHANDLER: Yeah.

MC: If I could get back and get the count situated for those who, you know what I mean? Cause it's always everybody else I'm waitin' on. So once I get they count situated, if they ready today, I'm gonna try to get over there and take care of it, you know what I mean?

CHANDLER: Right.

MC: Get the process started today. That way I could land by Tuesday.

CHANDLER: Uh huh.

MC: I'll let you know though, as soon as I put it all together.

CHANDLER: Alright, bud. Stay safe. Holler at me when you get back.

MC: You know it.

70

CHANDLER: Alright.

131.    I believe in the above conversation, CHANDLER was telling CONLEY that STOKES provided him with various strains of marijuana, but did not have "blues." CHANDLER named specific strains of marijuana, including "Gorilla Glue" and "Girl Scout Cookie." CONLEY indicated that he would have "blues" for CHANDLER in a few days, and I believe that CHANDLER is likely to have obtained those blues and is likely presently using his residence at **Target Location 4** to store marijuana and blues and that **Target Location 4** is likely to contain evidence of drug trafficking.

132.    On August 18, 2020, I observed a blue Ford Taurus sitting in a parking space directly in front of **Target Location 4.** It is my belief CHANDLER resides at **Target Location 4** and is continuing to engage in drug trafficking, as well as is using **Target Location 4** to further his drug trafficking activities.

## Target Location 5

133.    Throughout the investigation, Agents have believed Antwain FOX Sr. to be a co-conspirator of CONLEY, particularly concerning firearm possession and sale. Agents have confirmed FOX is on state probation in Kentucky, and his listed address is 3372 Appomattox Drive in Erlanger, Kentucky (**Target Location 5**). Agents have intercepted a number of incriminating conversations between CONLEY and FOX, which are further outlined below.

134.    On July 2, 2020, FOX called CONLEY, and the conversation is outlined below:

MC- Yo?

71

AF- Hey, he wanted like $200 for it. I mean $300, but I got him down to $200. It's brand new in the box.

MC- Oh yeah. I aint want it. I was gonna see if Lil Brother and them want it down there. I was trying to call them to see where they at, but they aint answer.

AF- U/I (talking over each other)

MC- I said, I was trying to see if one of them wanted down there at the trap. You feel me?  Cause they needed a new AC and they sleeping down there. But aint nobody answering the fucking phone. I don't wanna buy and have the shit sitting in the house. You feel me?

AF- Right. Do they need a shotgun?

MC- Huh? What is it?

AF- (Talking to someone else) Hey I asked him about. I asked him if he had any pistols for sale. He said he got a 4 5. He said he got a 4 5, and it take 4 5 shells and another type of shells , but I can't remember what he said. And he got a 38 Smith and Wesson snub nose

MC- (Exclaiming)

AF- Yeah. I'm trying to get those, but he said he work with a couple guys that got a couple handguns for sale too.

MC- We want them all.

AF- Right. I figured that. And he said he got a shotgun he can let go right now.

MC- What kind of shotgun?

AF- Uhhh. Twelve gauge.

MC- Is it uhh, short stock or long stock?

AF- I aint even asked him.

MC- Yeah. Check and see if it's like a sawed off short barrel one Cuz. You feel me?

AF- Okay

MC- Like the short handle. You know what I mean?

AF- I'm about to call him, because I just served him. Let me call him.

MC- Just handle your business. Just handle your business. I'm a pull out there on you anyway. Just call me when you get to the house.

AF- Okay. Bet

MC- Me and Candy gonna come out there and fuck wit yall anyway.

AF- U/I...about thirty minutes though.

MC- Alright. That's cool. That's cool.

135.    In the conversation above, FOX is informing CONLEY about firearms for sale. Although both are convicted felons prohibited from possessing firearms, FOX provides specifics about a .45 caliber handgun as well as a shotgun, and CONLEY states "We want them all". CONLEY then tells FOX to call him when FOX gets "to the house," which I believe to be **Target Location 5,** and CONLEY would meet up with him later.

136.    On the same day (July 2, 2020), FOX texted CONLEY "Call me sd9 9mm." I am aware an SD 9 is a specific type of Smith and Wesson 9 millimeter handgun. Minutes later, CONLEY called FOX, which is detailed below:

MC- Yo?

AF- You get that text?

73

MC- Mmm hmm. What he want for it?

AF- He um, told me to come up with a number. He's got three boxes of shells and two clips.

MC- I'll give him $300 for it tomorrow. Only because he got the boxes and clips.

AF- I think I might U/I, but we can work it out though. You know it'll still be in the family.

MC- yeah

AF- But I was just asking you because he told me um, come up with a number. I'm just trying to see what you'd say.

MC- $250 $300

AF- Okay

137. The above conversation again references a firearm for sale which FOX is asking CONLEY to offer a price for the gun.

138. On July 6, 2020, CONLEY and FOX spoke about firearms again, which is detailed below:

MC: Heyyyy.

AF: Un huh?

MC: You still got that little thing you sent a message to me with.

AF: Yep.

MC: Wuch you want for it?

AF: All man. This motherfucker.

MC: (Laughing)

AF: This motherfucker right here.

MC: I ain't really, I ain't really, I ain't trying to press you for it but one of my right hands need a little joint you feel me so I told him that I'll call my cuz and see whats what what. If you ain't tryin to get rid of it, it ain't no question.

AF: Hey, hey but look, check this out though, right. I uh, on the 4th of July I probably dumbed like 30 out that bitch right. That motherfucker is so smooth, the only reason why I done it, because the dude that I got it from, he said he was at shooters at the gun store. And he was out to buy a pistol, he said this white dude walked up in there and asked him was you out to buy a gun and he was like yeah. And you know my dude he one of those black dudes but he a white dude type motherfucker. So the dude sold my guy a pistol and guess what?

MC: What happened?

AF: The dude is the Florence police. So he got that motherfucking pistol just, just right.

MC: Wowwww.

AF: That motherfucker, that motherfucker is so tight, I mean up to me like, you know tight, (U/I), squeeze the trigger.

MC: Yeah, yeah.

AF: That motherfucker, it just hit, it just hits too smooth.

MC: I feel ya, that's how my is, that's how they are though, that's why I fuck with them.

AF: Yeahhh.

MC: They accurate, they mother fuckin light, they easy to handle, you feel me? You going to back a mother fucker ass all the way up.

75

AF: You known I ain't never had no mother fuckin SD,

MC: Yeah, yeah.

AF: But that mother fuckin SD, and it's in the 45 frame, dude that motherfucker fit right in your pocket.

MC: Yup.

AF: In your pocket.

MC: Hey bro that motherfucker is perfect. That's how I, that's why I deal with them compacts bro. Yeah, alright, I'm gonna let him know, now Cuz keeping that motherfucker he ain't sellin it (laughs).

AF: I don't know but you know I gotta about five to six of them joints.

MC: Of them compacts?

AF: You know I think that made number six. So i ain't really, I ain't really fucked up about selling it. It was just something I didn't even think about.

MC: Yeah, yeah, yeah, yeah.

AF: (U/I) I got that motherfucker right here right now.

MC: Ok, that's how it supposed to be. That's how I keep mine, I ain't going home without it, I ain't leavin home without that motherfucker. Could be everywhere. You hear me? The only thing, I almost walked into a god damn fireworks place with my joint on me.

AF: Ohhhh.

MC: I saw the sign before I went in, like ohhh shit, and the police was right there, they did't say nothing, I was like shit I gotta put my gun up. (U/I).

AF: And then, and then another good thing. Is, you know I've been smoking all mother fuckin couple of weeks anyway, and I new I had to go see them people. But something was telling me, fuck them, they ain't going through it.

MC: Yeah.

AF: So the bitch called, the bitch called me today and canceled my appointment. And she been canceling my appointments the last three or four times and I know motherfuckers that are still going up there to there PO. But she keep on canceling mine.

MC: Nah, your'e on low security bro, that's all that it. They don't have to worry about you.

AF: Ahh, that's whats up.

MC: Yo age, your health, you know what I mean. They look, you ain't piss dirty, you ain't gave them no reason to come fuck with you. Went to your classes. That be the whole thing that's why I tell niggas all time bro, just listen to a nigga, I had to go through the shit. You feel me?

AF: Just do what you supposed to and they not going to fuck with you.

MC: Yeah, give them 3 to 6 months of consistency and they going to lighten up on your ass cuz they got a whole bunch of knuckleheads they got to.

AF: Right, right.

MC: Just get two off your square. You feel me?

AF: Right, I didn't even think about that one. Motherfuckers out here being ignorant so they just fuck with the motherfuckers.

MC: No problems bro, they don't got time to be hastlin you.

AF: Look, I had to jump on (U/I) I just got back about 6:30, 7 o'clock this morning. Though my dude has some mother fuckin exotic. I bought two bags of that shit, be smoking. And um, on the bag, you can pop one of those bitches open and scent up the whole room.

MC: How many you got?

AF: Shit, I just bought me two of them, (U/I). I'm smoking on a blunt now because I knew that I wasn't going to see my PO. So soon she called me this morning, nigga I've been broke, I'm high as fuck.

MC: I already know, I need some god damn exotic. Shit I just smoked.

AF: Where you at?

MC: I'm headed to the house, headed to the house, I'm right here on Madison Pike. I just came from out your way.

AF: Yo crib.

MC: Yeah, I'm on my way to the house.

AF: Because you know it was just thundering and shit out here. U/I. Let me see how long this shit and I'll probably stop by and blow one with you.

MC: Alright I'll be at the house.

139. CONLEY and FOX fairly openly speak about firearms in the above conversation. FOX specifically mentions that after buying a certain firearm, he now owns around six, when he says "I don't know but you know I gotta about five to six of them joints." CONLEY responded "Of them compacts?" referring to compact-sized handguns, and FOX responds "You know I think that made number six. So i ain't really, I ain't really fucked up about selling it. It was just

78

something I didn't even think about." Later in the conversation, CONLEY mentions that he

nearly carried his firearm into a fireworks store. Fox also indicates that his is smoking a blunt

and had purchased two bags of marijuana.

140. On July 11, 2020, FOX called CONLEY, and the conversation is outlined below:

MC- Yo

AF- Aye, cuzzo.

MC- What up?

AF- Hey how much for an AR and a 9?

MC- Ummmmm, man what you think.

UM- Probably, band to 1100 if you want something high quality.

MC- 1100.

AF- Both of them how much?

MC- 1100, some quality shit.

AF- Yeah, so 1100 for both.

MC- Yup.

AF- You know somebody want a bad one, I mean bad.

MC- What kind A, I mean what kind um, nine?

AF- A Ruger.

MC- Yeah, I think, yeah that's what I'm saying like..

UM- What kind of Ruger?

MC- Send a pic.

UM- Like a SR9P, or LC9.

AF-Well, he about to, white boy about to umm, he about dude, dude about to try to get it a bit lower U/I, I'm going to hit you back. He gonna

MC- What? Where these mother fucking white boys getting all these guns from boy?

AF- I told ya, he go to the store, unless he get broke he sell, he been going to the casino and he done lost all his money.

MC- Man, really check into that shit cuz. For real man.

AF- Man, I been buying business from him for a minute. At least about two or three years.

MC- Yeah mother fucker interested in that bro.

AF- And he had a .38, but I might get that .38.

MC- Man get all that shit, get all that shit.

AF- He ain't hit me back.

MC- Trust me bro, trust me bro, it's going to be worth your while.

AF- Cuz, you know I still got that SD, I still got that SD.

MC- Come on you know I don't want to talk like that on the line cuz.

AF- Aight, I'll hit you.

141. Within the conversation above, FOX and CONLEY again speak of firearms and prices, and FOX mentions that he (FOX) may purchase a .38 (caliber of pistol) and states he still has the "SD," likely meaning the Smith and Wesson SD 9 millimeter. Near the end of the conversation, CONLEY tells FOX he doesn't want "to talk like that on the line;" meaning he is worried about interception of their conversation concerning firearms.

142. On July 20, 2020, FOX and CONLEY spoke about firearms, which is outlined below:

MC - Yo.

AF - What are you doing?

MC - I ain't doing shit, out here fuckin with Ray and my car.

AF - (U/I)

MC - What's happening?

AF - (U/I) I was just calling you to let you know that I got a, a, a throw away.

MC - Oh, for real?

AF - I just..

MC - What you want for it?

AF - I just, yeah I just.. I mean.. just give me a couple dollars but it's for the family though.

MC - What is it though?

AF - (U/I) you gonna, don't laugh at me. You gonna laugh at me.

MC - Mmm Hmm.

AF - It's a High Point.

MC - Oh ok, ok. Yeah that's nah, that ain't

AF - It's a .380 High Point but..

MC - (laughing)

AF - It's a (U/I) fuckin family (U/I).

MC - (laughing) You gonna get somebody in the family killed. (laughing)

AF - Huh?

MC - You gonna get somebody in the family killed, you better train them motherfuckas.

(laughing)

AF - (laughs) I'm in there like, like really, like really, it's really like for the family, like..

MC - Alright, alright.

AF - It's just something to keep right around.

MC - Yeah.

AF - It's just something that's laying around just in case.

MC - Alright, bet, bet. I'll hit you in a minute, I'm trying to get this car shit situated man, I'm a hit you right back.

AF - Man, if you got somewhere to put it you can come and snatch it and put it somewhere or I was gonna probably throw it up under my neighbors shed.

MC - Alright.

AF - But if you got somewhere, if you got somewhere or somebody needs it just pass it on

(U/I). Give me a call.

MC - Alright bet. I will. I got you.

AF - Alright (U/I).

143.    In the above conversation, FOX informs CONLEY that he obtained a Hi-Point .380 caliber "throw away" gun.  FOX later states that he may keep the firearm under his neighbor's shed, which is believed to be next to **TARGET LOCATION 5**, after offering it to CONLEY.

82

144.    On July 21, 2020, CONLEY and FOX speak about specific firearms again, and
FOX informs CONLEY he obtained another gun.  The transcript is detailed below:

MC- yooo hell nah, (Conley talking to some other person)

AF- (U/I)

MC- ah shit fitting to go to the crib what's the word

AF- shit bout to pick up this strap I'm going to need somewhere to put these
motherfuckers I need your help

MC- I ain't no bro I ain't no fucking peon nigga I don't have other nigga's guns i got my
own guns to hide, I pay I pay niggas to hide mine

AF- nah I was only saying that because you was saying you had a a dude over there by
my momma's house where I could take them to, that's the only reason why I'm saying it

MC- I'm trying to keep telling you bro your timing is off though cuz like what's wrong,
you could have been dropped that shit off and I could have had I could have had that put
up

AF- but these, these these new ones, the other one I called you about yesterday I just got
that yesterday and I'm about to go and pick this one up today, that's the only reason why
I called

MC- goddamn are you building an army are you building an army motherfucker, you and
Bam is driving me crazy

MC & AF both laugh

MC- what the fuck is wrong with you all man, you all starting a militia and you would let
little niggas talking or something (laughs)

AF- hey this motherfucker, this motherfucker got a 9 Taurus with a beam on it, I couldn't

let that pass up

MC- yeah you weren't supposed to neither bro, hey why don't you pull up on me

AF- alright let me finish this running around and I got to meet dudes I'm going to give

you a call in about an hour

MC- alright I'll pull up on you then

AF- alright

MC- alright

145.    In the above conversation, FOX informed CONLEY he obtained a Taurus 9

millimeter handgun with a beam, meaning a laser sight.  CONLEY questions him, apparently

jokingly, about building an "army" or "militia", presumably because of the volume of firearms

FOX was recently obtaining.  CONLEY and FOX also discuss where to put the firearms.

146.    On August 13, 2020, FOX and CONLEY spoke, which is detailed below:

MC - Yo

AF - Yo. Hello.

MC - What up though?

AF - Ok, old girl from umm.. that I talk to from the Naty, she talk about some she still

waitin but I  talk to my.. one of my guys from the D, he down here. These motherfuckers

is so ignorant right, this what he's gonna do. They come down here with 5 umm.. things

right.

MC - Yeah.

AF - You know what they did? (AF and MC start to talk over one another)

84

MC - What.

AF - They just went and posted up in, in, in Cincinnati and got rid of all 5 of em.

MC - Yeah, why wouldn't they.

AF - And they (U/I).. (AF and MC talk over one another)

MC - That's where you.. (AF and MC talk over one another) Oh so..

AF - Bro, I'm like these niggas is crazy as hell they didn't even know where they was at. They just went.. rode around to Cincinnati and was asking motherfuckas like, where the hood at, where the black motherfuckas at. So, where ever they went to that's where they posted up at, and, and, and had like a duffel bag with 5 of em up in there and got all of em gone like in 2 days.

MC - Hell yeah. For real.

AF - So this what they gonna..

MC - That's what he's supposed to do.

AF - This what they gonna.. because I told em that my lil dude, I was talkin about Bam. I said that he got some wet and k. And he said that's what his cousin got and he said that his cousin give him like a whole bunch of those bags too.

MC - Oh yeah?

AF - With each with 2 pounds, each pound you get, they give you a whole bunch of those bags that you put em in.

MC - So when can I go to the store and pop this shit bro?

AF - No, I'm tryin to get it to come down here so you ain't got to move.

MC - I don't need, I.. (AF and MC talk over one another)

AF - If I would have known because he was callin me..

MC - I don't need.. I just need, I just, I, I don't even bro listen we need that shit like yesterday we gonna leave right now. You feel me?

AF - Well he just got down here and he just told me he was going back umm.. Sunday. So I says, you think cuzzo, will, will come down here if I snatch 2 or 3 and he was like, hell yeah. So, I'm tryin to get him to just.. he, he callin him right as now as we speak.

MC - Well tell that nigga.. (AF and MC talk over one another)

AF - So as soon as he call me..

MC - Hey, hey tell them.. hey tell them niggas man if they over there grindin in that Naty they better keep that full on boy.

AF - Oh yeah, he, I just that's what I just left from, I just, I just gave him (U/I).

MC - Hell yeah, cause they fuckin shit up over there to boy.

AF - Yeah, I just gave him that SD.. because I'm gonna umm.. pick up.

MC - I hope..

AF - I'm about to go and pick up this other little bang to.. it's a small little 9 I'm about to go and pick up, I forget the name of it but you gonna like him.

MC - Alright just hit me when they active man.

AF - Ok, I got you cuz.

MC - Alright.

147.    Within the preceding conversation, FOX is making CONLEY aware of a group of drug traffickers who have come to the Cincinnati area from the "D," which I believe to mean Detroit, Michigan. FOX describes the quantity of drugs the group was trafficking, and

86

CONLEY stated "So when can I go to the store and pop this shit bro?" FOX subsequently responded "No, I'm tryin to get it to come down here so you ain't got to move". Additionally, FOX again mentions a firearm when he said "I'm about to go and pick up this other little bang too.. it's a small little 9 I'm about to go and pick up, I forget the name of it but you gonna like him." FOX, in my belief, is informing CONLEY that he is heading to obtain a 9 millimeter pistol, although, again, FOX is prohibited from doing so by virtue of his status as a convicted felon.

148.    On August 19, 2020, I conducted surveillance at **Target Location 5**. I observed a gold Lexus SUV parked in the yard, which was bearing Kentucky license plate 372 ZAH. The registration returned to FOX with a listed address of **Target Location 5.** Based on the intercepted phone calls, I believe that FOX is likely storing some of the many firearms he has acquired for himself and the CONLEY DTO in **Target Location 5**.

## CONCLUSION

149.    Based on my training and experience, drug traffickers routinely use their homes to store drugs, drug proceeds, and other evidence of drug trafficking. This is supported in this case by surveillance and wire interceptions that indicate that CONLEY, GILLIAM, STOKES, and CHANDLER have recently completed or attempted to complete drug deals at their residences or have brought drugs to their residences. I believe that FOX is possessing or has possessed firearms at his residences while being a convicted felon prohibited from owning a firearm and has discussed transferring those firearms to Conley, who is engaged in drug trafficking.

150.    Based on the investigation conducted by your Affiant, and other members of law enforcement, there is probable cause to believe that CONLEY, GILLIAM, STOKES,

CHANDLER, and other co-conspirators are involved in the ongoing illegal distribution of multiple controlled substances, including heroin, methamphetamine, and marijuana, in the Northern Kentucky/Greater Cincinnati area, in violation of 21 U.S.C. §§841(a)(1) and 846. The information gathered via surveillance, wire interceptions, controlled drug purchases, and other investigative techniques establishes that there has is an ongoing drug trafficking conspiracy since at least May 2020 and continuing to the present. I am aware that drug distributors commonly maintain several residences in order to conceal and protect illegal drugs as well as illegally obtained U.S. currency obtained from this lucrative illegal enterprise. Based on the investigation, there is also probable cause to believe that FOX and other co-conspirators are illegally possessing and transferring firearms in the Northern, Kentucky/Greater Cincinnati area, in violation of 18 U.S.C. §§ 922(g) and 924. As a result, there is also probable cause to believe that searches of the **TARGET LOCATIONS 1-5** (more particularly described in Attachments A-1 through A-5) will uncover evidence of these crimes; contraband, fruits of these crimes, and other items illegally possessed; and property used in committing these crimes (more particularly described in Attachments B-1 and B-2).

151. Based upon the facts described in this affidavit, I believe that **TARGET LOCATIONS 1-4** are utilized by **Conley, Gilliam, Stokes, Chandler,** and other members of the DTO in furtherance of ongoing narcotics activity, and I believe that **TARGET Location 5** is being utilize by FOX in furtherance of illegal firearm activity. CONELY and the other members of his DTO utilize the **TARGET LOCATIONS 1-4** as "stash houses" to conduct their drug trafficking enterprise and store contraband and drug proceeds. DTO members often utilize "stash house" locations to store large amounts of drugs and packaging to avoid detection by law

enforcement. I believe that DTO members keep large amounts of controlled substances, materials used for packaging, weighing, and processing drugs, cash and other proceeds, firearms, communication devices, and drug sales records inside **TARGET LOCATIONS 1-5**. Investigators know from their training and experience that drug traffickers will also keep drug proceeds, cellular telephones, scales, packaging materials, address books, buy/owe sheets, and other indicia that provide investigators with evidence of ongoing criminal conspiracies inside locations such as **TARGET LOCATIONS 1-5** and that probable cause exists to believe these items will be found there.

152.    Based on my training and experience, I also know that individuals engaged in drug trafficking routinely possess firearms in order to protect drugs and drug proceeds and routinely store those firearms in their homes. Wire interceptions have confirmed that Conley and Fox regularly possess firearms. There is also reason to believe that Fox has purchased firearms for use by the CONLEY DTO to further drug trafficking activities. Conley, Gilliam, Stokes, Chandler, and Fox are all convicted felons and are therefore prohibited from possessing firearms.

_____
Jeffrey S. McKinley
Special Agent
Drug Enforcement Administration

Subscribed to and sworn before me on this _26_ day of August, 2020.

_____
United States Magistrate Judge

89

## Attachment A-2
## 5113 Paddock Road, Apartment B/Apartment 2, Cincinnati, OH 45237





5113 Paddock Road, Apartment B/Apartment #2, Cincinnati, OH 45237, further described as a two story multi-family dwelling constructed with tan brick with red brick accents on the façade of the building. There is a red and white vertical striped awning extending over the front entrance to the building. The front entrance of the building is a green door with white drapes on the interior of the door. The handle to the front entrance door is on the left hand side and the door opens into a common area. The common area is a small vestibule with apartment doors on either side. There is a brown door with a brass door know leading to the rear of the building. A stairway leads to 2 more apartments on the second floor of the building. Mailboxes are adorned to the wall on the exterior of the building, outlining the main entrance door of the building. The mailboxes are labeled A1, B2, C3, and D4. Apartment B/Apartment #2 is located to the left on the first floor when immediately entering the common area. There is a brass numerical 2 affixed to the door, which is brown in color. A brass knob is on the right hand side of the door and the door opens into the apartment. The other doors in the apartment have numerals 1, 3, and 4 affixed to their exteriors. The door bearing numeral 1 is on the right hand side when entering the common area on the first floor. The doors bearing numerals 3 and 4 are on the second floor of the building. The door with numeral 3 is directly above the door with numeral 1 and the door with numeral 4 is directly above the door with numeral 4.

## ATTACHMENT B-1
### Particular Things to be Seized

The items to be seized are evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, specifically

1. Controlled substances;
2. Drug paraphernalia and items used to prepare controlled substances for sale/distribution;
3. Firearms and ammunition;
4. United States currency, other currency, gold, precious metals, rare coins, gold coins, jewelry, and financial instruments, including, but not limited to, stocks and bonds;
5. Electronic storage devices, such as digital personal organizers and cellular telephones capable of storing electronic data relating to phone numbers, text messages, and addresses; and surveillance equipment;
6. Indicia of occupancy, residency, dominion, control and/or ownership of the premises described above, and including, but not limited to, receipts and bills pertinent to maintenance and improvements, utility and telephone bills, canceled envelopes, and keys;
7. Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or objects relating to transporting, ordering, purchasing, processing, storing, and distributing controlled substances;
8. Address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of individuals to show associates of the occupants and indicia of occupancy;
9. Financial records, financial statements, receipts, statements of accounts and related bank records, money drafts, letters of credit, money orders and cashier's check receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transferring and/or concealing of assets and the obtaining, secreting, transferring, concealing, and/or expending of money.